Case No. 25-4035

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

**ELI ALAN GOICH,**

PLAINTIFF/APPELLLEE,

vs.

**WEBER COUNTY, et al.,**

DEFENDANTS/APPELLANTS.

**APPELLANTS Terry Thompson, Haley Manore Earl, Mikel Kilfoyle, Robyn Skidmore, and Weber County's OPENING BRIEF**

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
The Honorable Jill Parrish, Judge Presiding
Trial Court Case No. 2:18-CV-00731-JNP-DBP

Frank D. Mylar
Mylar Law, P.C.
2494 Bengal Blvd.
Salt Lake City, Utah 84121
Phone: (801) 858-0700
Office@MylarLaw.com
ATTORNEY FOR APPELLANTS
All Weber County Defendants/Appellants

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

Table of Contents .................................................................2

Table of Authorities................................................................3

Statement of Related Cases...........................................................7

Statement of Jurisdiction............................................................7

Statement of Issues on Appeal .......................................................9

Statement of the Case................................................................9

I.     Factual Background ..........................................................9

II.    Procedural History .........................................................15

Summary of Argument................................................................15

Argument...........................................................................17

III.   The individual Defendants were wrongfully denied qualified
       immunity. ..................................................................21

IV.    Weber County's claims are inexplicably intertwined with defendants. ........46

Conclusion .........................................................................47

Certificate of Compliance ..........................................................50

Addendum of Relevant Statutes and Constitutional Provisions ........................51

Certificate of Digital Submission...................................................52

Certificate of Service .............................................................53

District Court's Memorandum Decision and Order Partially Granting and
       Partially Denying the Parties' Cross Motions for Summary Judgment........54

# TABLE OF AUTHORITIES

**Cases**

*A.M. ex rel. F.M. v. Holmes*
    830 F.3d 1123 (10th Cir. 2016)............................................................ 19, 20

*Anderson v. Creighton*
    483 U. S. 635 (1987)...................................................................................21

*Apodaca v. Raemisch*
    864 F.3d 1071 (10th Cir. 2017)...................................................................23

*Ashcroft v. al-Kidd*
    563 U.S. 731 (2011).....................................................................................20

*Ashcroft v. Iqbal*
    556 U.S. 662 (2009)........................................................................ 8, 30, 33

*Bame v. Iron County*
    566 Fed. Appx. 731 (10th Cir. 2014).......................................................8, 46

*Behrens v. Pelletier*
    516 U.S. 299 (1996).................................................................................7, 8

*Berry v. Muskogee*
    900 F.2d 1489 (10th Cir. 1990)...................................................................31

*Blandin v. Smith*
    2024 U.S. App. LEXIS 9379 (10th Cir. 2024) ...................................... 18, 19

*Brosseau v. Haugen*
    543 U.S. 194 (2004).....................................................................................20

*Brown v. Montoya*
    662 F.3d 1152 (10th Cir. 2011)....................................................................7

*Burke v. Regalado*
    935 F.3d 960 (10th Cir. 2019)........................................................ 24, 25, 42

*City of Escondido v. Emmons*
    139 S. Ct. 500 (2019)...................................................................................21

*City of Los Angeles v. Heller*
        475 U.S. 796 (1986)....................................................47

*Clark v. Edmunds*
        513 F.3d 1219 (10th Cir. 2008)........................... 17, 23

*Connick v. Thompson*
        563 U.S. 51 (2011)......................................................33

*Crowson v. Wash. Cty. State of Utah*
        983 F.3d 1166 (10th Cir. 2020)................. 26, 27, 28, 42

*Elder v. Holloway*
        510 U.S. 510 (1994)....................................................21

*Estate of Jensen v. Clyde*
        989 F.3d 848 (10th Cir. 2021).....................................33

*Farmer v. Brennan*
        511 U.S. 825 (1994)........................................ 24, 31, 40

*Frey v. Town of Jackson*
        41 F.4th 1223 (10th Cir. 2022)......................................7

*Grimsley v. MacKay*
        93 F.3d 676 (10th Cir. 1996).......................................30

*Grissom v. Roberts*
        902 F.3d 1162 (10th Cir. 2018)....................................20

*Gutierrez v. Cobos*
        841 F.3d 895 (10th Cir. 2016).....................................18

*Hinton v. City of Elwood*
        997 F.2d 774 (10th Cir. 1993).....................................47

*Hope v. Pelzer*
        536 U.S. 730 (2002)....................................................19

*Langley v. Adams Cty.*
        987 F.2d 1473 (10th Cir. 1993)....................................21

*Mann v. Hyler*
        918 F.3d 1109 (10th Cir. 2019)....................................47

*Martinez v. Carr*
479 F.3d 1292 (10th Cir. 2007)...................................................................18

*Mata v. Saiz*
427 F.3d 745 (10th Cir. 2005).................................................. 37, 39, 42

*McBride v. CITGO Petroleum Corp.*
281 F.3d 1099 (10th Cir. 2002)...................................................................7

*McCracken v. Jones*
562 F.2d 22 (10th Cir. 1977).....................................................................26

*Meals v. City of Memphis*
493 F.3d 720 (6th Cir. 2007).......................................................................8

*Medina v. City and County of Denver*
960 F.2d 1493 (10th Cir. 1992)..................................................................20

*Mitchell v. Forsyth*
472 U.S. 511, (1985)....................................................................................7

*Monell v. New York City Dept. of Social Services*
436 U.S. 658 (1978)....................................................................................34

*Moore v. City of Wynnewood*
57 F.3d 924 (10th Cir. 1995).................................................................8, 46

*Mullenix v. Luna*
577 U.S. 7 (2015)........................................................................................20

*Okla. City v. Tuttle*
471 U.S. 808 (1985)....................................................................................34

*Pierce v. Gilchrist*
359 F.3d 1279 (10th Cir. 2004)..................................................................20

*Pino v. Higgs*
75 F.3d 1461 (10th Cir. 1996)....................................................................21

*Plumhoff v. Rickard*
572 U.S. 765 (2014)......................................................................................8

*Pollard v. City of Columbus*
780 F.3d 395 (6th Cir. 2015).......................................................................8

*Rife v. Jefferson*
    742 F. App'x. 377 (10th Cir. 2018) .................................................. 18, 19, 22

*Rojas v. Anderson*
    727 F.3d 1000 (10th Cir. 2013) ...................................................... 17, 18, 23

*Sealock v. Colorado*
    218 F.3d 1205 (10th Cir. 2000) ................................... 22, 36, 40, 42, 43, 44, 45

*Swint v. Chambers Cnty. Comm'n*
    514 U.S. 35 (1995) ....................................................................... 46

*Tanner v. McMurray*
    989 F.3d 860 (10th Cir. 2021) ......................................................... 34

*Thomson v. Salt Lake Cnty.*
    584 F.3d 1304 (10th Cir. 2009) ....................................................... 18

*White v. Pauly*
    580 U.S. 73 (2017) ............................................................. 16, 18, 19, 21

*Woodward v. Worland*
    977 F.2d 1392 (10th Cir. 1992) .................................................. 20, 21

*Workman v. Jordan*
    958 F.2d 332 (10th Cir. 1992) ........................................................ 21

*Ziglar v. Abbasi*
    137 S. Ct. 1843 (2017) ................................................................. 21

**Statutes**

28 U.S.C. § 1291 ................................................................................. 8

28 U.S.C. § 1331 ................................................................................. 8

42 U.S.C. § 1983 .............................................................................. 8, 52

**Rules**

FRCP 56 .......................................................................................... 8

## STATEMENT OF RELATED CASES

There are no prior or related appeals.

## STATEMENT OF JURISDICTION

The district court has "federal question" jurisdiction, pursuant to 28 U.S.C. § 1331, because Eli Alan Goich brought suit against Weber County, Sheriff Terry Thompson, Haley Manore Earl, Mikel Kilfoyle, and Robyn Skidmore under 42 U.S.C. § 1983 for alleged violations of his federal constitutional rights.

This case comes before the Court on an appeal from an order denying Defendants' motion for summary judgment, based upon qualified immunity, pursuant to Rule 56 of the Federal Rules of Civil Procedure. The district court issued its final summary judgment order on February 19, 2025. (Dkt. 190 at 1.)

Defendants/Appellants timely filed their notice of appeal on March 19, 2025. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 provides jurisdiction to the Courts of Appeals to all final decisions of the district courts of the United States.

A denial of a claim of qualified immunity is an appealable "final decision" within the meaning of 28 U.S.C. § 1291. *Brown v. Montoya*, 662 F.3d 1152, 1161 (10th Cir. 2011); *Frey v. Town of Jackson*, 41 F.4th 1223, 1233 (10th Cir. 2022); *McBride v. CITGO Petroleum Corp.*, 281 F.3d 1099, 1104 (10th Cir. 2002); *Behrens v. Pelletier*, 516 U.S. 299, 313 (1996); *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985).

"Under the collateral-order doctrine a limited set of district-court orders are reviewable 'though short of final judgment.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 671 (2009) (*quoting Behrens*, 516 U.S. at 305). "[P]retrial orders denying qualified immunity generally fall within the collateral order doctrine." *Plumhoff v. Rickard*, 572 U.S. 765, 772 (2014).

> This is so because such orders conclusively determine whether the defendant is entitled to immunity from suit; this immunity issue is both important and completely separate from the merits of the action and this question could not be effectively reviewed on appeal from a final judgment because by that time the immunity from standing trial will have been irretrievably lost. *Id.*

The Court may consider claims against Defendant Weber County because civil rights claims against a governmental entity, including official capacity suits that are "inextricably intertwined" with a valid qualified immunity appeal, may be heard based upon the doctrine of pendent appellate jurisdiction. *Bame v. Iron County*, 566 Fed. Appx. 731, 737 (10th Cir. 2014); *Moore v. City of Wynnewood*, 57 F.3d 924, 929-931 (10th Cir. 1995); *Pollard v. City of Columbus*, 780 F.3d 395, 402 (6th Cir. 2015); *Meals v. City of Memphis*, 493 F.3d 720, 727 (6th Cir. 2007).

## **INTRODUCTION**

Eli Alan Goich brought suit in the district court based upon his incarceration in the Weber County Jail, alleging state and federal constitutional claims against various officers in the Weber County Jail. This brief only concerns Plaintiff/Appellee claims under the United States Constitution against Weber County, Sheriff

Thompson, Nurse Manore Earl, Nurse Kilfoyle, and Nurse Skidmore. The four individuals are entitled to qualified immunity, and the County's claims are inextricably intertwined with the qualified immunity defenses.

## STATEMENT OF ISSUES ON APPEAL

1.     Did the trial court err in failing to review the case law cited by Plaintiff, Mr. Goich, to determine whether each individual Defendant violated the constitutional rights of Mr. Goich and to determine whether that right was clearly established in favor of Plaintiff's position prior to September 2017.

2.     Did the trial court apply an incorrect municipality liability standard, rather than an individual liability standard in determining that the Sheriff is not entitled to qualified immunity.

3.     If this Court rules in favor of the individual Defendants, should the court also enter judgment in favor of Weber County since its claims are "inextricably intertwined" with the claims of the individual Defendants in that there was no underlying constitutional violation by a county employee.

## STATEMENT OF THE CASE

### I.     Factual Background

Plaintiff Eli Alan Goich ("Goich") was a pretrial detainee at the Weber County Jail in Ogden, Utah. Mr. Goich was booked into Jail on August 11, 2017. (Dkt. 190 at 2.) Nurse Nikki Nielsen completed a medical intake with Mr. Goich on August

12, 2017, in which Goich reported a history of diabetes and listed several medications. (Dkt. 146-2 at 8.) Mr. Goich identified a dental complaint on August 16, 2017, along with concerns for a sleep study, colonoscopy and long-term Ibuprofen for arthritis. (*Id.* at 15-16.) He did not mention any concern about a rash on his scrotum.

On August 29, 2017, Nurse Crystal McFadden created a sick call note stating Mr. Goich needed to be seen due to ear pain and flu-like symptoms including a fever of 102.5 F. (Dkt. 136-3 at 4-5.) An appointment for Goich to see Dr. Wood was created for the following day. (*Id.* at 4.)

On August 30, 2017, at 7:09 a.m., Dr. Wood personally saw Mr. Goich at the Jail and reported that Goich's temperature was normal at 98.0 F, there appeared to be a "rash" in his groin area, there was "no edema Genitalia", and no other findings. (*Id.* at 4.) Dr. Wood prescribed Diflucan for the rash stating it was a possible yeast infection. (*Id.*) Mr. Goich's vitals were taken by CNA Linda Garcia and his body temperature was at 98.0 F. (*Id.*)

On August 31, 2017, at 7:26 a.m., Nurse Practitioner (NP) Westbroek, who worked for Dr. Wood, personally examined Mr. Goich at the Jail and reported "testicular pain and swelling" and that "inmate has scrotal edema, he reports fever and pain". (*Id.* at 3-4.) Mr. Goich's vitals were taken by non-defendant Nurse Denise

Heckert and Mr. Goich had a temperature of 99.3 F. (*Id.* at 4.) Nurse Practitioner Westbroek prescribed Bactrim and Ibuprofen for his scrotal edema. (*Id.* at 3.)

On August 31, 2017 at 10:54 a.m., CNA Garcia received a call from a supposed Heather Hunt, who purported to be the caretaker of Mr. Goich's mother. She stated that Mr. Goich had a problem with his testicles. (Dkt. 136-6 at 1-2.) However, there is no evidence that CNA Garcia told anyone this information.

Following Nurse Practitioner Westbroek's assessment and treatment of Mr. Goich on August 31st, he ordered an ultrasound of Mr. Goich's scrotal area. Matt Lowe with Schryver Medical, LLC. performed a scrotal ultrasound, per the order, and noted from the ultrasound that the impression is a left scrotal hernia and questionable left epididymitis of the scrotum. (Dkt. 146-2 at 27.)

On August 31, 2017, at 4:35 p.m., the results were faxed from Schryver Medical to the jail. (Dkt. 136-5.) At about 5:44 p.m., Nurse Trent Lingard reviewed the results and called Dr. Wood to discuss them. (Dkt. 136-3 at 3.) In doing so, Nurse Lingard made a chart note per Dr. Wood's instructions to keep Mr. Goich on an antibiotic (Septra) as prescribed. (*Id.*) The results from the ultrasound confirmed the sonographer's impression of left epididymitis and right hernia. (Dkt. 136-5.) Importantly, the ultrasound findings did not mention anything about Fournier's Gangrene. (*Id.*)

On September 1, 2017, Defendant Nurse Haley Manore began working her first day at the jail. (Dkt. 190 at 21.) At 4:59 p.m. that day, she assessed Mr. Goich's condition during his sick call visit, reviewed his prior treatments, cleaned the abscess in his groin area, applied barrier cream to same area, and provided ABD pads to Mr. Goich to address the drainage that was occurring. (Dkt. 136-6 at 1.)

After treating Mr. Goich, Nurse Manore called Dr. Wood and reported her findings. (*Id.*). In response, Dr. Wood doubled the dosage of the previously prescribed antibiotic and added a second antibiotic to treat what was believed to be epididymitis. (*Id.*) It is undisputed that Nurse Manore recorded in Goich's medical record that he had a "quarter sized abscess near his rectum that is draining" and recorded that the skin around his genitals and anus was "extremely red and excoriated [and his] testicles [were] approximately the size of a small cantaloupe with a dark black/greenish area noted to underside of testicles." (Dkt. 136-6 at 1.) Nurse Manore informed the night nursing staff, including Defendant Nurse Mikel Kilfoyle, of the assessment and plan of care. (*Id.*)

Neither Nurses Manore nor Kilfoyle had prior knowledge of or experience in treating Fournier's gangrene. (Dkt.140 at 16; *also see* Dkt. 141 at 10.) However, Nurse Kilfoyle knew that Nurse Manore had called and spoken to Dr. Wood about Goich's current condition because Nurse Manore told him so. (Dkt. 136-6 at 1.)

On the evening of September 1, 2017, Nurse Kilfoyle was working the night shift with another nurse. Nurse Manore told Nurse Kilfoyle, before she left her shift, about the plan of care for Mr. Goich. (*Id.*) Nurse Kilfoyle reviewed and closed a sick call request from Mr. Goich at 6:18 p.m., believing the matter had been addressed. (Dkt. 136-7 at 2.) He checked Mr. Goich's blood sugar twice during his shift. The first one was completed at 9:01 p.m., and the second at 5:24 a.m. (Dkt. 136-4 at 2.) While Mr. Goich's blood sugar was being checked at 9:00 p.m., he asked for additional ABD pads, which Nurse Kilfoyle supplied, and asked if he needed anything else. (Dkt. 136-6 at 1.)

On September 1, 2017 at 11:21 p.m., during a routine medical check, Mr. Goich told Nurse Kilfoyle of his constipation. (*Id*.) Nurse Kilfoyle knew from Nurse Manore that Mr. Goich would be seeing the doctor on Tuesday. (*Id*.)

On September 2, 2017 at about 9:30 a.m., Nurse Robyn Skidmore administered Goich's diabetes medication. (Dkt. 136-4 at 2.) At about 10:30 a.m., another nurse observed Mr. Goich sleeping. (Dkt. 136-8.) At about noon, Mr. Goich called into booking asking to be seen. (Dkt 136-3 at 2.)

When he reported to Jail medical, Mr. Goich was treated by Defendant Nurse Skidmore. (*Id*.) He reported "[M]y penis has retracted into my testicle[s] and I won't be able to urinate". (*Id.*) At about 12:15 p.m., Nurse Skidmore examined Mr. Goich and noted severe swelling and edema in his genital area and testicles. (*Id*.) Nurse

Skidmore immediately contacted Dr. Wood and reported the seriousness of his condition. (*Id.* at 3.) Dr. Wood ordered that Mr. Goich be sent to the hospital for treatment. (*Id.*)

Following Dr. Wood's instructions, Nurse Skidmore arranged for Mr. Goich's prompt transfer to the hospital; the time of transfer was approximately 12:41 p.m. (Dkt. 136-9 at 1.) Nurse Skidmore had not heard of Fournier's gangrene prior to this incident but recognized the severity of the symptoms that she observed on September 2, 2017 and acted promptly. (Dkt. 136-3 at 2-3, and Dkt 142 at 8.) Mr. Goich was successfully treated for what was diagnosed at the hospital as Fournier's Gangrene.

Sheriff Terry Thompson was the Sheriff and final policymaker in 2017. He did not know anything about Mr. Goich and his medical problems until after this lawsuit was filed. In addition, he was not familiar with Fournier's Gangrene until after this suit was filed. Moreover, the Sheriff did not know Mr. Goich was suffering from a serious medical condition at the time he was in Jail (Dkt. 144 at 3-5.) Sheriff Thompson is not listed on any of Mr. Goich's medical documents. Furthermore, Sheriff Thomspon was not notified of any reported deficiencies in the jail medical department. (Dkt. 144 at 7-8.) And most importantly, Mr. Goich never cited cases of prior unconstitutional conduct related to inmate medical care at the Weber County Jail.

## II.     Procedural History

Mr. Goich alleges his Fourteenth Amendment rights were violated by Defendants/Appellants when he claims they denied him constitutionally required medical care for his serious medical condition. Mr. Goich claims that three Jail nurses and the former Sheriff acted with deliberate indifference to his serious medical needs in violation of the Fourteenth Amendment. Defendants/Appellants brought a motion for summary judgment in the district court, based upon qualified immunity. The district court denied summary judgment to Defendants/Appellants. This appeal was timely filed and is based upon the argument that, pursuant to existing case law, Defendant/Appellants did not violate clearly established law and that the County's claims are inextricably intertwined with the qualified immunity defenses of Weber County, Sheriff Thompson, Nurse Manore Earl, Nurse Kilfoyle, and Nurse Skidmore.

## <u>SUMMARY OF ARGUMENT</u>

The district court did not apply the correct legal standard for qualified immunity. It repeated an error that the United States Supreme Court said is common of lower courts holding,

> Today, it is again necessary to reiterate the longstanding principle that "clearly established law" should not be defined "at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011). As this Court explained decades ago, the clearly established law must be "particularized" to the facts of the case. *Anderson*

*v. Creighton*, 483 U. S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987). Otherwise, "[p]laintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Id.,* at 639, 107 S. Ct. 3034, 97 L. Ed. 2d 523.

Moreover, if a case presents a "unique set of facts, it is an indication that qualified immunity should apply. *White v. Pauly*, 580 U.S. 73, 79 (2017). *Pauly* corrected the frequent error that the Circuit Court failed to identify a case where an officer under similar circumstances violated the plaintiff's rights. *Id.* Instead, the lower court in *Pauly* cited seminal Supreme Court cases, and their progeny from the Circuit Court of Appeals, that merely recited general statements of the law.

In the case of Mr. Goich, the District Court did not and could not cite cases where a Sheriff and three nurses acted similarly under similar circumstances because there are no on-point published cases in the Tenth Circuit dealing with a rare but dangerous ailment. To the contrary, the cases that have the closest fact pattern ruled in favor of the defendant sheriff and nurses. In its ruling, the district court misapplied the law relating to supervisory training liability as it would apply to the Sheriff who was not involved in the incident. It further ignored the clearly established law as it applies to the three nurses in that the nurses faithfully called the doctor and strictly followed doctor orders. However, the doctor, Radiologist, and the Nurse Practitioner misdiagnosed Mr. Goich with a far less serious condition and that error was replicated in the nurses' treatment and care for Mr. Goich. Yet, all three nurses

provided extensive treatment and care for Mr. Goich and none of them refused to treat or care for Plaintiff. As a consequence of these errors, in denying qualified immunity to the four individuals, the district court in turn failed to dismiss the County for lack of an underlying constitutional violation.

## **ARGUMENT**

*Standard of review for all issues:*

We review the district court's grant of summary judgment de novo, reviewing the evidence in the light most favorable to the nonmoving party." *Rojas v. Anderson, 727 F.3d 1000, 1003 (10th Cir. 2013)* (*quoting Clark v. Edmunds,* 513 F.3d 1219, 1221-22 (10th Cir. 2008)). However, decisions that involve a qualified immunity defense are treated differently than other summary judgment rulings. *Id.* "When a defendant asserts a qualified immunity defense, the burden shifts to the plaintiff to satisfy a strict two-part test: (1) The plaintiff must show that the defendant's actions violated a constitutional or statutory right; and (2) The plaintiff must show that this right was clearly established at the time of the conduct at issue." *Id.* "If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment—showing that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law." *Id.* This two-part test is not a trivial matter but a "heavy [] burden" for the plaintiff to

overcome. *Id.* (*quoting Martinez v. Carr,* 479 F.3d 1292, 1294 (10th Cir. 2007)). The district court never shifted the burden to the Plaintiff.

The district court focused on whether a dispute of material fact existed for which a reasonable jury could find in favor of the Plaintiff. That analysis is premature until the court first finds that the two elements of qualified immunity are not met. See *Rojas,* 727 F.3d at 1006, (*quoting Thomson v. Salt Lake Cnty.,* 584 F.3d 1304, 1327 (10th Cir. 2009)* (Holmes, J., concurring)). Mr. Goich was required to direct the district court to case law that established the two elements of qualified immunity. See generally *White,* 580 U.S. at 79 and *Rife v. Jefferson,* 742 F. App'x. 377, 381-382 (10th Cir. 2018)

The requirement that a constitutional right be clearly established requires more than a citation to a case. *Gutierrez v. Cobos,* 841 F.3d 895, 902 (10th Cir. 2016). Absent a sufficient legal argument specifically addressing the proposed constitutional violation, a case citation will not suffice. *Id.* Nor are mere "vague and conclusory statements" sufficient. *Blandin v. Smith,* 2024 U.S. App. LEXIS 9379, at *2 (10th Cir. 2024) (unpublished). Specifically, in *Blandin,* the court rejected the plaintiff's objection to qualified immunity. *Id.* at *3-4. The court, construing the appellant's filings liberally, had to nonetheless reject his arguments for his inability to meet the two-part test. *Id.* at *4. The plaintiff's brief did not cite "a single case that might show the officers violated his rights." *Id.* at *3. Nor is it enough to cite a

case to refute qualified immunity. *Id*. The appellant must show specifically how the case shows a violation of a constitutional right and connect it to the officer's conduct. *Id*. Mere conclusions are not a substitute for proper analysis that creates a link between an officer's actions and "a flagrant violation of the appellant's constitutional rights." *Id.* at *3-4. The District Court made many general conclusions in applying fact to law.

Qualified immunity "does not require a case directly on point for a right to be clearly established, [but] existing precedent must have placed the statutory or constitutional question beyond debate." *White*, 137 S. Ct. at 551 (internal citation omitted). To demonstrate that the law was clearly established, Plaintiff "must identify a case in which a defendant 'acting under similar circumstances' as [Defendants] 'was held to have violated' the Eighth or Fourteenth Amendments." *Rife*, 742 F. App'x. at 381-382 (*quoting White,* 137 S. Ct. at 552).

A case "on point" is not required to have completely equivalent circumstances to address a constitutional violation. *A.M. ex rel. F.M. v. Holmes*, 830 F.3d 1123, 1135 (10th Cir. 2016). The Supreme Court has held that "officials can still be on notice that their conduct violates established law" when there is some novelty to the factual circumstances of a violation. *Id*. (*quoting Hope v. Pelzer,* 536 U.S. 730, 741 (2002)). "The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly

establish the violation." *Id*. (*quoting Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004)). However, this "less specificity" allowance for overtly egregious conduct must still meet the high burden of specificity of clearly established law from a case addressing the violation, that qualified immunity requires. *Mullenix v. Luna*, 577 U.S. 7, 11-12 (2015).

The Supreme Court in *Mullenix,* emphasized that courts may "not define clearly established law at a high level of generality." *Id*. (*quoting Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). "The dispositive question is whether the violative nature of *particular* conduct is clearly established." *Id*. (internal quotations omitted). To answer that question may not be answered on broad or general propositions but "in light of the specific context of the case". *Id*. (*quoting Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)).

"'Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains.'" *Woodward v. Worland*, 977 F.2d 1392, 1397 (10th Cir. 1992) (*quoting Medina v. City and County of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992)). By "on point," the Tenth Circuit does "not mean that the precedent has merely stated a general proposition of applicable law." *Grissom v. Roberts*, 902 F.3d 1162, 1168 (10th Cir. 2018). Woodward also noted that "a single recent case from one circuit is

not sufficient to make the law clearly established in another circuit." *Woodward*, 977 F.2d at 1397 (internal citations omitted).

Qualified immunity must be granted "if a reasonable officer might not have known for certain that the conduct was unlawful. *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017). "[T]he clearly established law must be 'particularized' to the facts of the case." *White*, 137 S. Ct. at 552 (*quoting Anderson v. Creighton*, 483 U. S. 635, 640 (1987)). That is, "the clearly established right must be defined with specificity." *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019).

## III.   The individual Defendants were wrongfully denied qualified immunity.

***Standard of Review:***
The Tenth Circuit reviews "the presence or absence of qualified immunity de novo." *Pino v. Higgs*, 75 F.3d 1461, 1467 (10th Cir. 1996) (*quoting Langley v. Adams Cty.*, 987 F.2d 1473, 1476 (10th Cir. 1993)). Whether a defendant is entitled to qualified immunity based on a given set of facts is a "purely legal" question reviewed for correctness. *Workman v. Jordan*, 958 F.2d 332, 336 (10th Cir. 1992); *see also Elder v. Holloway*, 510 U.S. 510, 516 (1994) ("Whether an asserted federal right was clearly established at a particular time, so that a public official who allegedly violated the right has no qualified immunity from suit, presents a question of law.").

***Discussion:***

The district court failed to properly apply the doctrine of qualified immunity for the four individual Defendants, and it committed the same errors that the United States Supreme Court has cautioned lower courts about for decades. The district court cites general statements of law and then proclaims that Plaintiff has raised a disputed issue of fact to show the nurses failed in their gatekeeping roles, ignoring the fact that the nurses called the doctor and that the doctor and nurses misdiagnosed Mr. Goich. The district court recites from this Court's decision in *Sealock v. Colorado*, 218 F.3d 1205, 1211 (10th Cir. 2000) that "deliberate indifference occurs when prison officials prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment. (Dkt. 190, at 17). This is exactly the general statement of law that the Supreme Court has rejected and corrected on numerous occasions.

Plaintiff bore the burden in the district of identifying case law that was on point with the facts of Mr. Goich's case. *See Rife*, 742 F. App'x at 381. He failed to meet this burden. The district court further erred by turning directly to whether an issue of fact existed to preclude summary judgment instead of to prior on point case law. The Court should have first looked for cases on point with similar fact patterns

that show both a constitutional violation and that the law was clearly established prior to September 2017. See *Rojas*, 727 F.3d at 1003.

When qualified immunity is raised by a defendant, the burden shifts to the plaintiff to show (1) that a plaintiff's constitutional right was violated by defendant and (2) that the right was clearly established at the time of the incident. *Id.* "If and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment – showing that there are no genuine issues of material fact and the he or she is entitled to judgment as a matter of law." *Id.* (quoting *Clark*, 513 F.3d at 1221-22). The district court erred in beginning and ending with a traditional summary judgment analysis, giving the nonmovant the benefit of the doubt regarding all factual issues and inferences.

The facts relevant to a qualified immunity inquiry are not disputed, and although there are some facts found by the district court that occurred after the incident or are not supported by any evidence, these factual issues do not affect this Court's qualified immunity determination. See *Apodaca v. Raemisch*, 864 F.3d 1071, 1075 (10th Cir. 2017). (jurisdiction for qualified immunity is based strictly on deciding the issues as a matter of law.) This brief will address each Defendant/Appellant separately for purposes of qualified immunity.

Courts have consistently drawn a critical distinction between negligent medical care and deliberate indifference under the Eighth and Fourteenth

Amendments. *Burke v. Regalado*, 935 F.3d 960, 992 (10th Cir. 2019). While both may involve substandard treatment, they differ fundamentally in nature and constitutional significance. *Id.* at 992-993. Negligence, even when it results in the improper treatment of a serious medical condition, does not amount to deliberate indifference. *Id.* Of course, deliberate indifference is a much higher standard than even gross negligence or civil recklessness; it is criminal recklessness. *Farmer v. Brennan*, 511 U.S. 825, 836-40 (1994). A medical professional who misdiagnoses a condition or provides inadequate care after an examination, while potentially liable under state tort law, does not violate the Constitution if their conduct lacks the requisite culpable state of mind. *Burke*, 935 F.3d at 993. This is because such actions, though possibly incompetent, still reflect an effort to treat the patient rather than to ignore or obstruct treatment. *Id.* at 992.

In contrast, deliberate indifference requires a showing of purposeful inaction or intentional interference with medical care. *Id.* at 993-994. It is not merely about making a wrong medical decision, but about knowingly disregarding an excessive risk to an inmate's health. *Id.* at 993. This includes scenarios where prison officials prevent access to care or refuse to act as gatekeepers to qualified medical personnel. *Id.* at 994. In *Burke,* the court found the medical staff deliberately indifferent when they failed to act completely when confronted with a serious medical condition by not attempting to determine the inmate's condition or administer care. *Id.* Nor was

there any evidence of the nurse in question attempting to communicate the inmate's condition to other medical staff. *Id.* at 993-95. The court cited a complete lack of care as justification for a finding of deliberate indifference. *Id.* at 994-95. But was there a complete lack of care of Mr. Goich, as supported by reported case law?

Appellee has not identified cases, and Appellants have not found any cases, that clearly establish a serious medical need from the symptoms Mr. Goich exhibited to the Defendants/Appellants nor do any cases find deliberate indifference with how Appellants provided medical care. The key facts common to all three nurses is that the inmate was seen by a doctor and Nurse Practitioner, the nurses contacted the doctor several times, and all of the nurses took significant action to treat the inmate and followed all doctor orders. Those facts, based upon pre-2017 case law in the Tenth Circuit, show they did not violate the Constitutional rights of Plaintiff/Appellee.

There is no case on point in the Supreme Court or the Tenth Circuit, that addresses Fournier's Gangrene in the context of a correctional facility, and the medical treatment that is required under the Eighth Amendment. There are no protocols for this very rare jail condition. Furthermore, even if Mr. Goich was able to cite a case, there is still no case showing deliberate indifference on the part of medical personnel in treating Fournier's Gangrene. Lastly, all individual Defendants were entitled to rely upon the assessments of the medical personnel as a matter of

law, namely Dr. Wood and Nurse Practitioner Westbroek. *See McCracken v. Jones, 562 F.2d 22, 24 (10th Cir. 1977)*. There is no dispute that the nurses all followed the doctor's orders and provided medication, wound care, and other medical treatments and care to Mr. Goich. This is not a case where the nurses failed to take any action or treat the inmate as one defendant in *Mata* or *Sealock*. This is a case of a misdiagnosis by a doctor, radiologist, and Nurse Practitioner.

In this case, all individual Defendants are entitled to qualified immunity because none of their undisputed acts were contrary to clearly established law and none of them violated the constitution as stated in case law prior to September 2017. It is undisputed that Dr. Wood, his Nurse Practitioner, and the doctor that completed the ultrasounds, all diagnosed Mr. Goich with a medical condition that was not serious when being treated with antibiotics. There is no dispute that any Jail employees or the contract medical professionals ever believed or thought Mr. Goich might have Fournier's Gangrene. This is simply a case of mistaken diagnosis for all involved, and it alone mandates granting qualified immunity for both elements.

In cases involving claims of deliberate indifference to serious medical needs under the Eighth Amendment, courts have consistently distinguished between actions taken based upon a misdiagnosis as compared to knowingly failing to care for a serious known diagnosis. *Crowson v. Wash. Cty. State of Utah*, 983 F.3d 1166, 1180-81 (10th Cir. 2020). In *Crowson v. Washington County*, the Tenth Circuit

reversed the lower court's denial of summary judgment for a nurse and a doctor who both misdiagnosed the inmate as having a much less serious condition. *Id.* at 1181-82. Only after the inmate was sent to the hospital several days later was he diagnosed with a very serious toxic metabolic encephalopathy. *Id.* at 1173. The nurse and the doctor both thought he was suffering from drug or alcohol withdrawal. *Id.* The inmate was delayed going to the hospital for seven days. *Id.* The lower court further found that the nurse failed to pass on "critical information" to the doctor when he called the doctor three days later. *Id. at 1179.* The Tenth Circuit concluded in *Crowson* that Nurse Johnson did not violate Crowson's constitutional rights because he referred the inmate for a mental health evaluation which was consistent with the nurse's belief that he was suffering from mental health issues "caused by the ingestion of illicit drugs or alcohol." *Id. at 1180.*. The Court concluded that Nurse Johnson attempted to refer Crowson to a provider for a mental health evaluation by making a notation in Mr. Crowson's file and that action was sufficient to negate deliberate indifference even though Nurse Johnson observed "alarming symptoms" and the medical need of Crowson was far more serious than Nurse Johnson suspected. *Id.* The Court held,

> Because Nurse Johnson did not "completely refuse[] to fulfill [his] duty as gatekeeper," and instead, referred the "prisoner to a physician assistant for medical treatment," *Mata v. Saiz*, 427 F.3d 745, 758 (10th Cir. 2005), he was not deliberately indifferent to his gatekeeper role. *Id*. Nurse Johnson's attempted method of referral may have been negligent, but it was not

27

deliberately indifferent. *See Farmer*, 511 U.S. at 835 ("[D]eliberate indifference describes a state of mind more blameworthy than negligence.").

*Id.* The acts of Manore, Kilfoyle, and Skidmore similarly did not constitute deliberate indifference because they reasonably believed Mr. Goich had a common testicular infection that was being treated with antibiotics prescribed by a doctor and they consulted the doctor who further reinforced their misdiagnosis.

In addition to an obvious misdiagnosis of a very rare condition, none of the Defendants were aware of all of the facts and all of the risks to Mr. Goich, but only those facts stated in Jail medical records cited and the District Court's order. There are no cases that establish the precise protocol for jails to employ to deal with inmates with Fournier's Gangrene. They monitored his condition, consulted with medical professionals, and gave him prescribed medication. They both treated and fulfilled their gatekeeper roles. These actions, of providing ongoing care to Mr. Goich, could not put them on notice that they were violating his constitutional rights. Defendants/Appellants did not violate the constitution by their actions, and they could not have known they acted unconstitutionally toward Mr. Goich. Appellee Goich cannot cite any appellate cases that demonstrate that the Appellants' actions were contrary to clearly established law.

## A. Sheriff Thompson, as a supervisor, did not violate clearly established law.

The district court found that Plaintiff presented evidence to establish a genuine dispute of fact regarding whether staff at WCCF had proper medical training, supervision, and protocols in place to handle emergencies. (Dkt. 190 at 20-22). The district court found that Plaintiff identified deficiencies in the jail's training program, including a lack of oversight for new nurses and the absence of any documented training for staff like Nurse Manore. *Id.* These deficiencies, the court reasoned, may have contributed to the delay in Plaintiff's hospitalization and the resulting injuries. *Id.* at 22. Although these are not "actions" or "conduct" by Sheriff Thompson that could expose him to liability, he was not responsible for training medical personnel in the manner the trial court suggests because he is not a doctor.

Sheriff Thompson testified that he delegated medical training responsibilities to qualified medical professionals, which is action contrary to the claim of deliberate inaction. Relying on licensed professionals for training and oversight is a legitimate and wise delegation of duty and not, in itself, evidence of deliberate indifference. Moreover, Plaintiff has not identified a specific constitutional violation directly tied to Thompson's conduct. Allegations of training deficiencies, without evidence of personal involvement or direct action by Thompson, do not satisfy the legal threshold for supervisory liability under § 1983. The district court relied heavily on

circumstantial evidence and fail to demonstrate that Thompson personally caused or was directly involved in the alleged violation.

The district court did not state what conduct of Sheriff Thompson violated the constitution, and it did not correctly apply qualified immunity to Sheriff Thompson. It further applied the law for supervisory and training liability incorrectly in that the court applied the law as if the Sheriff were a municipality and not an individual. *Iqbal* clarified and changed the law regarding individual supervisory liability to such an extent that the dissent claimed it was completely abolished. *Iqbal*, 556 U.S. at 692-93. Based upon *Iqbal*, a plaintiff must show the personal participation of an individual supervisor before liability can be found and plaintiff must show intentional misconduct. *Id.* at 675-677. Neither are shown in the District Court's Memorandum Decision which requires the application of qualified immunity.

The law has not been clearly established after *Iqbal* in the Tenth Circuit what standards apply when individual officials are sued for their supervisory and training duties. Sheriff Thompson argues that the prior case law, allowing for liability without direct involvement by an individual supervisor, as opposed to a municipality, no longer exists. An individual supervisor cannot be liable merely because he promulgates or does not promulgate policies or training. See *Grimsley v. MacKay, 93 F.3d 676, 680 (10th Cir. 1996)*. The facts relied upon by the district court have nothing to do with the case law regarding individual supervisory training liability

but seem to mirror municipal liability standards which require a lower mental state of civil recklessness. See *Berry v. Muskogee,* 900 F.2d 1489, 1495-96 (10th Cir. 1990). The "should have known standard" is not applicable to individual liability. See *Farmer*, 511 U.S. at 836-40.

More importantly, the District Court does not state exactly what actions of the Sheriff constituted a violation of the Constitution. The District Court's states "[h]ad medical staff been properly trained or had Jail staff taken his medical complaint seriously, Plaintiff would have been sent to the hospital before he was nearly dead." (Dkt. 190 at 26). Every Sheriff would automatically be held liable in every medical case if this were the standard. The statement by the trial court is mere opinion and says nothing of Sheriff Thompson's actions or his mental state. Only the Sheriff's actions matter in a qualified immunity analysis, not what other people did or did not do. There are no cases in the Tenth Circuit that automatically hold a Sheriff liable merely because more training would have prevented constitutional harm, when there was never prior notice of previous and similar constitutional harm.

However, in addition to the cited caselaw in *Sealock,* the testimony of both the jail staff, nurses, and Dr. Wood, via Goich's complaint, show that it was policy that it was only upon Dr. Wood's approval that an inmate could be sent to the hospital. (Dkt. 19-1 at 13, 17, 25). A non-medical Sheriff cannot override a medical doctor. That would be deliberate indifference when it is a matter of inmate medical

decisions. The Sheriff has no business practicing medicine. His policy was to let the Doctor and Nurse Practitioner practice medicine. Goich was informed that inmates could not be taken to the hospital without medical staff approval. (*Id.* at 19.) Jail staff informed Goich that they cannot take anyone to the hospital without medical staff approval. (*Id.* at 25.) Nurse McFadden specifically told him that only Dr. Wood could authorize such a transfer. (*Id.* at 13.) Dr. Wood emphasized that he alone had the authority to determine Goich's care, including authorizing hospitalization. (*Id.* at 19.) In any event, clearly established law does not require a nurse to override the clear direction of a medical doctor.

We know that Sheriff Thompson required 24-hour a day, seven days a week nursing coverage at the Jail and that he had a medical administrator who had a Ph.D. in nursing. We know he contracted with a doctor and his mid-level providers to provide professional medical care and treatment to Jail inmates. No case law concludes that the actions of Sheriff Thompson, in a purely supervisory role, with no knowledge of the inmate, could have constituted a constitutional violation. The District Court's factual references cannot support the conclusion that Sheriff Thompson was deliberately indifferent to Mr. Goich's medical needs.

Most important is the fact that all of the reasons stated by the district court assume that Sheriff Thompson had no personal involvement in training any of the nurses. He had no knowledge or involvement with Mr. Goich's care. The only way

to find supervisory liability under *Iqbal* for individual supervisors is when they are personally involved in causing the constitutional deprivation. *Iqbal*, 556 U.S. at 675-77.

The district court further erred in failing to find that the Sheriff had actual knowledge of a prior pattern of unconstitutional conduct by nurses in the Jail. A pattern of similar constitutional violations by untrained employees is "ordinarily necessary" to demonstrate deliberate indifference for purposes of failure to train. See *Connick v. Thompson*, 563 U.S. 51, 62 (2011). Plaintiff failed to allege, cite cases, or submit evidence of any prior unconstitutional medical issues similar to the facts of this case. For this reason alone, qualified immunity should have been granted because there were no prior unconstitutional incidents regarding jail nursing and no evidence of deliberate indifference by the Sheriff because there was no notice of a problem to the Sheriff.

Additionally, in *Estate of Jensen v. Clyde* the court recognized that a medical doctor could be assigned the responsibility of establishing protocol and provide training and subsequently be held liable when the protocols and training were inadequate. *Estate of Jensen v. Clyde*, 989 F.3d 848, 857-58 (10th Cir. 2021). Additionally, the Tenth Circuit clarified that a doctor who holds final authority over

medical decisions in a correctional setting functions as the "ultimate decision maker." *Tanner v. McMurray*, 989 F.3d 860, 862 (10th Cir. 2021).

Thompson relied on the training and professional judgment of the Jail's medical staff to manage inmate healthcare. At the time, Dr. Kay Haw, managed the nursing staff. The Jail typically had at least two nurses on every shift, and Thompson was aware of a training program in place to assist newly hired nurses in adapting to the Jail's environment. Mr. Goich's experience is not sufficient to establish policy that says otherwise.

Under *Monell*, proof of a single incident of unconstitutional conduct is generally insufficient to establish an unconstitutional policy unless there is also proof that the underlying policy is unconstitutional and that can be directly attributed to a municipal policymaker. *Okla. City v. Tuttle*, 471 U.S. 808, 823-24 (1985) (*quoting Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978)). Without such a showing, liability cannot rest solely on the occurrence of the incident. *Id.* Without separate proof of an unconstitutional policy and its connection to a policymaker, liability cannot be imposed, as doing so would circumvent *Monell*'s requirement that liability arises only from deliberate decisions by policymakers. *Id. at 823.*

Applying this standard, Sheriff Thompson's actions, the county's policy, and its training program would not constitute a constitutional violation if there is no

evidence that he consciously adopted an inadequate training regimen or enforced a policy that was itself unconstitutional. If the alleged misconduct was an isolated event, and there is no proof that Sheriff Thompson acted with deliberate indifference, such as ignoring known risks, prior incidents, or warnings, then the most that can be shown is negligence, which is insufficient under *Tuttle*. Absent evidence of a deliberately chosen policy or pattern of unconstitutional conduct, the requirements of *Monell* and *Tuttle* are not met, and no municipal liability can be imposed.

Thompson, acting as Sheriff, signed the contract with Dr. Wood and his team of mid-level practitioners to provide medical diagnosis and treatment for inmates. To Thompson's knowledge, Dr. Wood and his staff consistently delivered the necessary medical care to inmates throughout 2017, and he was not aware of any concerns regarding the adequacy of their treatment. (Dkt 144 at 6-8.) While Dr. Haw helped manage and supervise the nursing staff, Thompson understood that the nurses operated under the supervision of Dr. Wood, who was ultimately responsible for determining whether an inmate's condition could be treated at the Jail or required hospitalization. Qualified Immunity should have been granted for these additional reasons. The Sheriff's conduct did not violate the Constitution.

### B. Nurse Skidmore did not violate clearly established law.

The district court found a factual dispute about when Skidmore learned of Plaintiff's condition and whether Plaintiff called booking beforehand, allowing a

reasonable jury to conclude Skidmore knew of the urgent need but failed to act for hours. (Dkt. 190 at 20). However, the district court ignored the fact that when Skidmore examined Plaintiff, she took immediate action, called Dr. Wood, and got him ready to send to the hospital. She only provided Plaintiff with medical care and treatment and she never failed or refused to treat Mr. Goich. For these reasons she is entitled to qualified immunity.

Nurse Skidmore and another nurse worked on Sunday morning, September 2, 2017. When Skidmore first saw Plaintiff she examined him and called the doctor and got him ready to send to the hospital. Less than three hours passed from when Skidmore first saw Goich and when she sent him to the hospital. Those actions could not violate the constitution or clearly established law based upon *Sealock*. At worst, Nurse Skidmore misdiagnosed or followed the doctor's misdiagnosis and treatment. Such a misdiagnosis, based upon the caselaw, does not violate the constitution. See *Sealock*, 218 F.3d at 1211 ("At worst she misdiagnosed appellant and failed to pass on information to the P.A."). Moreover, in *Mata*, the nurse was given qualified immunity even though she told the inmate with severe chest pains to go back to her cell and come back when the clinic was open. That same nurse evaluated Mata at the clinic and was not considered to be deliberately indifferent because she provided

some care even though she delayed care for over an hour. *Mata v. Saiz,* 427 F.3d 745, 759 (10th Cir. 2005).

When Nurse Skidmore saw Mr. Goich, she addressed his concerns and immediately noted them and called Dr. Wood. (Dkt. 190 at 20). She then immediately sent Plaintiff to the hospital. *Id. Mata* made clear that when considering a delay in treatment, the delay must be for a "known medical risk". *Mata*, 427 F.3d at 760. It is clear that Skidmore became aware of Goich's serious medical condition when she saw him right before noting his condition and calling Dr. Wood. (Dkt. 190 at 5). Nor is there evidence that Goich informed Skidmore of his condition when he was initially seen at 9:30 a.m. *Id.* The mere fact that Skidmore carefully examined the inmate, called the doctor, and sent him to the hospital is sufficient to grant her qualified immunity.

Only nurses and officers who refuse to provide any treatment or care or fail to call a doctor are denied qualified immunity according to *Mata* and *Sealock*. There are no Fournier's Gangrene cases on point and none of the nurses were familiar with it, making qualified immunity even more pertinent in this case. Taking some action to care for the inmate and calling a provider negate liability per Tenth Circuit case

law and the district court failed to show otherwise. It was legal error to not grant Nurse Skidmore qualified immunity.

### C. Nurse Kilfoyle did not violate clearly established law.

The district court found that Plaintiff presented specific facts that Kilfoyle was likely aware of the serious nature of his medical condition, having seen his urgent complaint and allegedly done nothing in response. Based on this, the court held that a reasonable jury could find Kilfoyle had personal knowledge of the severity of the condition and that a genuine dispute of fact exists as to whether he was deliberately indifferent to Plaintiff's medical needs. (Dkt. 190 at 19). Again, the problem with the court's analysis is that it is backwards. A court must start with Tenth Circuit and United States Supreme Court case law not with whether there are sufficient facts to send the case to the jury.

The record shows that Kilfoyle knew Nurse Manore had just called Dr. Wood and obtained more antibiotics and a course of treatment of Plaintiff's ailments in the Jail. Nurse Kilfoyle knew that another nurse fulfilled the gatekeeper role. The treatment plan was in the medical record and Kilfoyle followed it. He was entitled to rely upon the doctor's treatment plan that was in the medical record. There are no appellate precedents in this Circuit which prevent a nurse from relying upon the words of another nurse that she called the doctor and obtained a course of treatment. No case law says Kilfoyle should have questioned that. So, Nurse Kilfoyle can also

rely upon the fact that a doctor was just called before he came on shift. He would have no knowledge about that Dr. Wood would several years later in a deposition deny that he received all of the information in the note. Nurse Kilfoyle did not fail to provide necessary information to Dr. Wood, but he did rely upon the medical record as to what Dr. Wood ordered for Mr. Goich. (Dkt 136-6 at 1.)

Further, Nurse Kilfoyle continued to care for Plaintiff's medical needs by bringing medication, drainage pads for his scrotum, and addressing his blood sugars. (Dkt 136-4 at 2, and 136-6 at 1.) These facts show that he did not violate the constitution according to existing case law. It is only the nurses who refuse to do anything to care for a serious medical need who can be denied qualified immunity. See *Mata, 427 F.3d at 755-56*. In *Mata*, Nurse Weldon was denied qualified immunity because she knew Mata had chest pains and she told her to come back in the morning. She did not offer a Tylenol, water, a more comfortable mattress, or anything else. She said to return in the morning. Because she did nothing, she failed her role as a gatekeeper while knowing she had severe chest pains that could lead to death. *Id.* Kilfoyle never had such knowledge of Mr. Goich's condition and he took significant actions to treat Mr. Goich. Both negate deliberate indifference.

Moreover, again, there are no Fournier's Gangrene cases on point and that is enough to grant qualified immunity. He never refused to treat Plaintiff. These facts

alone dictate qualified immunity, Again, the nurse in *Mata* that was denied qualified immunity completely refused to treat and care for the plaintiff.

**D.    Nurse Manore Earl did not violate clearly established law.**

The district court stated that there was a reasonable dispute about whether Manore fully relayed Goich's condition to Dr. Wood and cited that if Manore had failed to pass along sufficient information to Dr. Wood, that this may have been more than mere negligence. (Dkt. 190 at 18-19). However, that ruling is squarely opposite of Tenth Circuit case law, where qualified immunity was granted. First, more than negligence is far from deliberate indifference. The standard is "criminal recklessness" *Farmer*, 511 U.S. at 836-40.

The Court in *Sealock* faced the exact same dilemma of a dispute of fact as to what a nurse told a medical provider. In *Sealock*, the Physician Assistant claimed, just like Dr. Wood, that if all of Nurse Huber's note was read to him he would have sent the inmate to the hospital. P.A. Havens in *Sealock* claimed that Nurse Heber never told him the inmate had "throbbing pressure pain in chest and throat" *Sealock, 218 F.3d at 1208*. Severe chest pain is probably one of the most significant symptoms to be relayed to a doctor. Yet, the nurse's failure to disclose such vital symptoms did not deprive her of qualified immunity, but it did for the P.A. *Id*. at 1211. The case law always puts more responsibility on the doctor or provider. This is because a doctor and a Nurse Practitioner can diagnose and prescribe medications, and they

40

have a wealth of knowledge about treating serious medical needs. These providers must ask questions if they are not getting a complete picture. The case law was clear in 2017 that if a dispute existed about what a nurse told a doctor about critical life-threatening symptoms, the nurse was given qualified immunity, and the provider was not. The trial court, therefore, erred in law by failing to grant Nurse Manore qualified immunity because she called the doctor to report findings, even if crucial symptoms were omitted, and she took action to treat the inmate. Both actions negate liability.

Even if the contents of Nurse Manore's phone call are in dispute, there is sufficient evidence to show that Nurse Manore provided elevated care and notified multiple nurses of Goich's condition. What is not in disputed is that Nurse Manore called Dr. Wood, informed him of Goich's foul-smelling draining abscess near his anus. Dr. Wood ordered an increase in antibiotics, a CBC draw, and for Goich to be moved to medical. (Dkt 136-6 at 1.) This phone call came less than a day after Dr. Wood received a phone call from RN Lingard describing the ultrasound results that "findings suspicious of left epididymitis", which is an infection of the testicles that calls for urgent action. (Dkt. 190 at 2-3). Taken in combination that it was understood that only Dr. Wood could send an inmate to the hospital, Dr. Wood was effectively on notice of the seriousness of Goich's condition, and it is reasonable for Nurse Manore to rely on Dr. Wood's judgment. This is similar to how Nurse Johnson in *Crowson v. Washington County* was allowed to rely upon the doctor's diagnosis and

treatment even though he purportedly witnessed "alarming symptoms" and failed to pass on critical information to the doctor *Crowson,* at 1178-79. Nurse Manore is in no different position than Nurse Johnson was in *Crowson* and this court reverse the lower court's denial of qualified immunity because Nurse Johnson provided some care and he relied upon the course of treatment by the doctor.

The Tenth Circuit has consistently shown that communicating an inmate's symptoms to a higher-up" that a nurse has fulfilled her gatekeeping role. *Id.* at 1181. Qualified immunity is preserved where there is no underlying constitutional violation, as deliberate indifference requires more than a showing of negligence or inadequate treatment. *Id.* at 1183-84. *Crowson* showed that the Tenth Circuit clarified that medical personnel fulfill their constitutional "gatekeeper" duties when they report an inmate's symptoms to a higher medical authority. *Id.* at 1181. (*quoting Burke*, 935 F.3d at 993). So long as a provider communicates the patient's condition up the chain of command, even if the ultimate diagnosis is incorrect, they are generally shielded from liability. *Id. Mata* comes to the same conclusion. *Mata,* 427 F.3d at 759.

*Sealock* is particularly applicable*,* where a jail nurse, having misdiagnosed the inmate's symptoms of his serious medical condition, was nonetheless entitled to qualified immunity. *Sealock,* 218 F.3d at 1211. Specifically, the nurse in *Sealock* saw the inmate in the infirmary at 6 a.m. complaining of severe chest pain and the

inability to breathe. *Id*. at 1208. The nurse noted his excessive vomiting and concluded that he must have the flu and couldn't do anything for him. *Id*. The only treatment that the nurse attempted to give the inmate was merely Tylenol, which the inmate was unable to keep down due to his continued vomiting. *Id*. Two hours later, the nurse relayed her assessment over the phone to the P.A. including "throbbing pressure pain in chest and throat." *Id*. The P.A. ordered the inmate to get a full day of rest, and a follow-up with the inmate would occur 29 hours later. *Id*. At the follow-up appointment, the inmate complained that "his chest was killing him, he couldn't breathe, and that the pain had traveled into his arms." *Id*. After the inmate was subsequently rushed to the hospital, it was determined that he had suffered a major heart attack. *Id*. The alleged failure to disclose life-threatening chest pains was no less severe than what Dr. Wood claims Nurse Manore failed to disclose. But like *Sealock*, significant treatment was prescribed by Dr. Wood which belies his claim that he was not told some pretty significant symptoms. (Dkt 136-6 at 1.) But the dispute does not matter for qualified immunity purposes as far as the nurse is concerned.

There are several significant parallels between *Sealock* and the case at hand. First, there is a similar time between the inmate's initial presentation of symptoms to a nurse and their eventual hospitalization. In *Sealock*, the inmate first saw Nurse Huber at 6:00 a.m. on January 23, but was not hospitalized until after 1:00 p.m. on

43

January 24, a delay of 31 hours. *Sealock*, 218 F.3d at 1208 By contrast, Mr. Goich was first seen by Nurse Manore on September 1 at about 4:29 p.m. and was hospitalized at 12:41 p.m. on September 2. This was a delay of 18 hours from when she first saw Mr. Goich after Nurse Manore called Dr. Wood. (Dkt. 190 at 3-5).

Second, both nurses (i.e. in *Sealock* and Manore) charted observations, misdiagnosed, and relayed some version of the facts to a provider. In *Sealock,* Nurse Huber noted that Sealock had "throbbing pressure pain in chest and throat" and relayed her notes, which included continuous vomiting, to PA Havens over the phone. *Sealock*, 218 F.3d at 1208. She gave the inmate only Tylenol. *Id.* However, Havens denied being told about the chest pain, and the court held that even if she failed to communicate critical symptoms or misdiagnosed, that conduct amounted to at most negligence, not deliberate indifference. *Id.* at 1208, 1211.

Similarly, Nurse Manore documented severe symptoms: excoriated skin, abscess, and notably, testicles "the size of a small cantaloupe with black/greenish areas." (Dkt. 190 at 4). She cleaned the area, increased his antibiotics per Dr. Wood's new order, and relayed her findings via phone to Dr. Wood, who later testified he wasn't told about the most alarming symptoms. *Id.* at 4-5. Dr. Wood concedes that he was at least told that Plaintiff had flu-like symptoms and a foul-smelling, draining abscess near his anus. *Id.* at 4. Like Huber, Manore recorded the findings,

administered care, and followed a communication protocol, even though the report is in dispute.

Third, both nurses had disputed phone communications relaying their assessments to their respective medical providers. Both providers dispute what they were told by the nurses and claim that they would have ordered the inmate to the hospital if they had been told more. In *Sealock*, PA Havens testified that had he been told about chest pain, he would have "called an ambulance immediately." *Sealock, 218 F.3d at 1211*. Nurse Huber claimed she told him; he said she did not. *Id. at 1212*. Instead, PA Havens ordered a follow-up appointment the following day. *Id. at 1208*. Similarly, Dr. Wood testified that he would have "sent him to the hospital immediately" if Manore had told him about the size and color of Goich's testicles. (Dkt. 190 at 4-5). Instead, Dr. Wood gave specific follow-up instructions for treatment and increased antibiotics. Dr. Wood initiated aggressive treatment for Mr. Goich in that phone call as documented in the Jail medical records. (Dkt 136-6 at 1.)

Additionally, both nurses relayed all information to the next shift. With all these facts for the nurse in *Sealock,* she was granted qualified immunity, despite the disputed phone call that would have led to earlier hospitalization. *Sealock, 218 F.3d at 1211*. The court stated "At worst, she misdiagnosed appellant and failed to pass on information to P.A. Havens". *Id*. *Sealock* is substantially similar to the case at hand. In fact, it could be argued that Nurse Manore displayed even more care than

the nurse in *Sealock*. She did more than simply giving Tylenol to Goich, and there was less of a delay between her care and Goich's hospitalization. Therefore, based upon the caselaw, Nurse Manore should have been granted qualified immunity because she did not violate the constitution based upon the *Sealock* case.

## IV. Weber County's claims are inexplicably intertwined with defendants.

Weber County is entitled to reversal on appeal because the individual defendants are entitled to qualified immunity. Because all of the defendants should be dismissed as a matter of law, so should the claims against the County. There is no underlying constitutional violation by a county employee. The Tenth Circuit has "discretion to exercise pendent appellate jurisdiction over an otherwise nonfinal and non-appealable order if it is 'inextricably intertwined' with an appealable decision or where review of the non-appealable decision is 'necessary to ensure meaningful review' of the appealable decision." *Bame*, 566 F. App'x at 737 (*quoting Swint v. Chambers Cnty. Comm'n,* 514 U.S. 35, 50-51 (1995)). "[A] pendent appellate claim can be regarded as inextricably intertwined with a properly reviewable claim on collateral appeal . . . when the appellate resolution of the collateral appeal necessarily resolves the pendent claim as well." *Moore*, 57 F.3d at 930.

County liability is inextricably intertwined because Plaintiff sues Weber County based upon what its employees did or did not do in caring for Goich. Plaintiff must show an underlying constitutional violation by at least one Weber County

employee and that the underlying constitutional violation. *See Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993); *see also City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986), and *Mann v. Hyler*, 918 F.3d 1109, 1117 (10th Cir. 2019) ("A municipality may not be held liable for the actions of its employees if those actions do not constitute a violation of a plaintiff's constitutional rights.") Plaintiff cannot show an underlying constitutional violation by any of the Defendants as explained above. No findings by the district court support a finding of deliberate indifference on behalf of any county employee. Moreover, the district court never found that a county policy directly caused a constitutional violation.

## <u>CONCLUSION</u>

The District Court committed an all-too-common error in its application of qualified immunity to the four individual Defendants/Appellants by using broad and general statements of the law that arguably apply to every medical case arising out of incarceration. There are no cases of Fournier's Gangrene reported in the Tenth Circuit to give guidance as to what the state of the law was in 2017. This is significant and should not just ignored, especially when the medical condition was being reviewed and assessed by a doctor and Nurse Practitioner and the nurses were following their orders. The Providers, however, were mistaken in their diagnosis and this is alone is sufficient reason to grant qualified immunity for the nurses. The District Court further failed to shift the burden of proof to the Plaintiff/Appellee to

provide case law showing that the two elements of qualified immunity are satisfied before moving to the issue of whether a reasonable jury could find deliberate indifference. The District Court failed to compare the facts from the Jail medical records with the

The lower court further failed to apply the correct legal standard for individual liability based upon a defendant's supervisory responsibilities. The District Court decision does not state non-conclusory facts that could support a finding of deliberate indifference of Sheriff Thompson who was sued only as a general supervisor, with no knowledge of the incident.

The District Court assumed, without sufficient facts that each of the four individual Defendants/Appellants acted with deliberate indifference by failing to take action to address Plaintiff/Appellee's medical needs. The Jail Medical records show that qualified immunity should have been granted to the nurses because all three took significant action to treat Plaintiff/Appellee and they either called the doctor or relied upon another nurse who called the doctor to seek specific guidance.

## REQUEST FOR ORAL ARGUMENT

This case includes some tangential issues of first impression based upon the doctrine of qualified immunity and individual supervisory liability and Appellants respectfully request that this matter be set for oral argument at a convenient time for the Court.

**WHEREFORE:** The Court should reverse the district court's decision on summary judgment and grant the four individual defendants qualified immunity and hold that they did not violate the constitution based upon prior existing case law in the Tenth Circuit. In addition, this Court should rule that the lower court applied an incorrect legal standard of liability as applied otherwise an individual defendant who is sued in his supervisory capacity. Finally, the Court should hold that all claims against Weber County are dismissed with prejudice because there is no underlying constitutional violation by a Weber County employee needed to support a constitutional claim against Weber County.

Dated this 23rd day of July, 2025.

/s/ *Frank D. Mylar*

Frank D. Mylar

MYLAR LAW, P.C.

2494 Bengal Blvd.

Salt Lake City, Utah

Phone: (801) 858-0700

Office@MylarLaw.com

Attorney for Appellants

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 10,420 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

/s/ *Frank D. Mylar*

Frank D. Mylar
MYLAR LAW, P.C.
2494 Bengal Blvd.
Salt Lake City, Utah
Phone: (801) 858-0700
Office@MylarLaw.com
Attorney for Appellants

# ADDENDUM OF RELEVANT STATUTES
## AND CONSTITUTIONAL PROVISIONS

**U.S. Const. amend. XIV, sec. 1:**

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

**42 U.S.C. § 1983:**

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

## CERTIFICATE OF DIGITAL SUBMISSION

I certify that

A.     All required privacy redactions have been made.

B.     The hard copies of any pleading required to be submitted to the clerk's office are exact copies of the ECF filing.

C.     The ECF submission was scanned for viruses with the most recent version of a commercial virus scanning program (Webroot SecureAnywhere, Version 9.0.40.53, fully updated as of July 23, 2025), and according to the program is free of viruses.

/s/ *Frank D. Mylar*

_____

Frank D. Mylar, USB #5116

MYLAR LAW, P.C.

2494 Bengal Boulevard

Salt Lake City, Utah 84121

Phone: (801) 858-0700

office@mylarlaw.com

Attorney for Appellants

## CERTIFICATE OF SERVICE

I certify that on this 23rd day of July 2025, a true and correct copy of the

above Appellants Weber County et al.'s Opening Brief and Request for Oral

Argument was served by Court's CM/ECF system, to the following:

Daniel L. Steele, USB #6336
SUMSION STEELE & CRANDALL
765 N. Main St.
Spanish Fork, UT 84660
Telephone: (801) 426-6888
dan@sumsionsteele.com

Bron Rammell
MAY, RAMMELL & WELLS, CHARTERED
216 W. Whitman
Pocatello, Idaho 83204-0370
Telephone: (208) 233-0132
Idaho State Bar No. 4389
bron@mrwlaw.com

Attorneys for Plaintiff/Appellee

/s/ *Frank D. Mylar*

_____

Frank D. Mylar, USB #5116
MYLAR LAW, P.C.
2494 Bengal Boulevard
Salt Lake City, Utah 84121
Phone: (801) 858-0700
office@mylarlaw.com
Attorney for Appellants

**District Court's Memorandum Decision and Order Partially Granting and Partially Denying the Parties' Cross Motions for Summary Judgment**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| ELI ALAN GOICH,<br><br>　　　　Plaintiff,<br><br>v.<br><br>WEBER COUNTY, et al.,<br><br>　　　　Defendants. | **MEMORANDUM DECISION AND ORDER PARTIALLY GRANTING AND PARTIALLY DENYING THE PARTIES' CROSS MOTIONS FOR SUMMARY JUDGMENT**<br><br>Case No. 2:18-cv-00731-JNP-DBP<br><br>District Judge Jill N. Parrish<br><br>Magistrate Judge Dustin B. Pead |

Before the court are the parties' cross-motions for summary judgment. This action stems from Plaintiff Eli Alan Goich's ("Plaintiff") incarceration at the Weber County Correctional Facility ("WCCF" or "the Jail") from August 11, 2017 to September 2, 2017. Plaintiff's complaint alleges that Defendants exhibited deliberate indifference and reckless disregard for his obvious medical needs, thereby violating his constitutional rights under the Eighth and Fourteenth Amendments, which are secured by the Civil Rights Act, 42 U.S.C. §§ 1983, 1988, and the Constitution of the State of Utah.

On December 20, 2022, the court granted the parties' stipulated motion to dismiss with prejudice Defendants Wasatch Correctional Medical Services, LLC, Dr. John Wood, and Ryan Westbroek. On August 16, 2024, the court granted the parties' stipulated motion to dismiss with prejudice Defendants Trent Lingard, Crystal McFadden, Chris Nation, Alisha Sacco, Randy Ferrin, and Denise Heckert.

On March 15, 2024, the remaining Defendants, Haley Manore Earl, Mikel Kilfoyle, Robyn Skidmore, Nikki Nielsen Ryan, Sheriff Terry Thompson, and Weber County (collectively, "Defendants") moved for summary judgment on all claims. ECF No. 136 ("Defs.' Mot."). The same day, Plaintiff also moved for summary judgment on his claims against Defendants Manore Earl and Weber County. ECF No. 146 ("Pl.'s Mot."). For the following reasons, the court **GRANTS IN PART** Defendants' Motion with respect to Plaintiff's federal claims against Defendant Nielsen Ryan and **DENIES IN PART** Defendants' Motion with respect to Plaintiff's federal claims against Manore Earl, Kilfoyle, Skidmore, Sheriff Thompson, and Weber County and Plaintiff's state law claim against all Defendants. The court also **DENIES** Plaintiff's Motion.

## BACKGROUND

This lawsuit centers on Defendants' alleged acts and omissions in providing medical care to Plaintiff at the Weber County Jail from August 29, 2017 through September 2, 2017.

### I.    PLAINTIFF'S MEDICAL CONDITION

Plaintiff was admitted to the Weber County Correctional Facility as a pretrial detainee on August 11, 2017. At the time, Plaintiff was a 51-year-old obese man with Type II Diabetes. Defendants knew from Plaintiff's medical intake on the first day that he was insulin dependent. ECF No. 146-2 ("Appendix") at 8. On the afternoon of August 29, Plaintiff reported to Crystal McFadden, RN, at sick call that he had an earache and fever. McFadden took Plaintiff's vitals and discovered he had a temperature of 102.5 degrees Fahrenheit. In her report following the interaction, McFadden noted that Plaintiff "NEEDS TO BE SEEN !!!!!!!!!!..." *Id.* at 13.

The following day, Plaintiff was seen by Dr. John Wood who noted a rash in Plaintiff's groin area. Dr. Wood prescribed Plaintiff 200 milligrams of Diflucan. *Id.* The next morning, Plaintiff was examined by Ryan Westbroek, RN, who ordered a prescription for Bactrim and an

ultrasound of Plaintiff's scrotum. *Id.* at 12-13. Dr. Sean Johnston performed the ultrasound that afternoon and reported "Impression: Findings suspicious of left epididymitis. Recommend clinical correction. Right inguinal hernia." *Id.* at 28. That evening, another nurse, Trent Lingard, RN, called Dr. Wood to report the ultrasound results. Lingard later testified in his deposition that epididymitis, an infection of the testicles, is a concerning and urgent problem. *Id.* at 146. Dr. Wood responded to Lingard's report that he would check on Plaintiff the next morning and instructed Lingard to keep administering antibiotics to Plaintiff as prescribed. *Id.* Lingard provided no further medical care that evening.

At 7:14 a.m. on September 1, Plaintiff initiated a sick call request stating, "I need to go to the hospital. My condition here is not improving b[u]t deteriorating . . . My genitals double in size every day and no treatment is working. I would like to be checked at the hospital." *Id.* at 398. The record of Plaintiff's request has no response from medical staff except for the closing of the request that evening by Mikel Kilfoyle, RN, with the response, "This has been previously addressed." *Id.*

Medical providers did not respond to Plaintiff's sick call request until late afternoon, even though Plaintiff asked jail staff several times to address his pain, rectal drainage, and foul odor. In his declaration, Plaintiff states that he "continued to complain to every officer [he] came into communication range with because [he] was terrified." ECF No. 164-1, Ex. 25 ("Goich Decl.") ¶ 38. In response, staff members told Plaintiff that he would have to take his grievance up with medical and that they had no authority to do anything about Plaintiff's medical care. *Id.* ¶ 9.

The smell emanating from Plaintiff was so repulsive that inmates began to complain to jail staff. But instead of sending Plaintiff to medical, staff ordered him to take a shower. Eventually one of the staff members concluded that Plaintiff's odor may be more than poor

hygiene and notified medical. Custodial personnel also initiated a Temporary Restriction Order to move Plaintiff to a more restrictive cell, reasoning that "[i]nmate has a medical condition that causes him to have a bad odor. For his safety, he will be leveled down." Appendix at 432.

Finally, by late afternoon, Plaintiff was moved to a medical cell where Haley Manore Earl, RN, examined him. This was Manore Earl's first day on the job. When Plaintiff arrived, the medical cell was covered in blood and feces. Goich Decl. ¶ 57. Jail staff told Plaintiff that if he wanted a clean cell, he would have to clean it himself. *Id.* ¶ 57 ("I was basically told to stop complaining and clean the cell myself."). Plaintiff testified that this treatment was "typical" of Jail staff. *Id.* ¶ 77. Staff offered Plaintiff a mop and bucket, but Plaintiff told them that he was physically unable to clean the cell because he was so sick. *Id.* ¶ 58. Plaintiff testified that, at this point, even if he had access to a tablet to file a grievance, he would not have been able to do so. *Id.* ¶ 57.

After examining Plaintiff, Manore Earl reported that he had a "quarter sized abscess near his rectum that is draining." Appendix at 18. She also noted that the skin around his genitals and anus was "extremely red and excoriated" and that his "testicles [were] approximately the size of a small cantaloupe with a dark black/greenish area noted to underside of testicles." *Id.* Rather than elevating Plaintiff's status to seek emergency care, Manore Earl simply cleaned Plaintiff's abscess, gave him gauze pads for the drainage, and increased his antibiotic dosage. Manore Earl then called Dr. Wood to report the situation.

What exactly Manore Earl said to Dr. Wood during the call remains in dispute. Dr. Wood testified that Manore Earl told him that Plaintiff had flu-like symptoms and a foul-smelling, draining abscess near his anus. *Id.* at 100. She also told Dr. Wood that Plaintiff had been "calling down many times during the day, calling down and making a fuss." *Id.* Dr. Wood noted in his

deposition that if Manore Earl had reported the size of Plaintiff's testicles and their coloring, he would have sent him to the hospital immediately. *Id.* at 101.

At the end of her shift, Manore Earl passed on the report of Plaintiff's condition and possible need for extra gauze pads to Mikel Kilfoyle, RN, and Nikki Nielsen Ryan, RN, the nurses on night shift. *Id.* That evening, Kilfoyle dispensed additional gauze pads in Plaintiff's cell and recorded that Plaintiff was unable to have a bowel movement and had not done so for several days. *Id.* at 554. Kilfoyle did nothing else in response, except administer diabetes medication to Plaintiff the following morning at 5:24 a.m. *Id.* at 624. He did not examine Plaintiff or ask about his condition. But he did close out Plaintiff's request for help. *Id.* at 398.

The next morning, on September 2, Plaintiff was in intense pain and could not urinate due to the swelling of his testicles. He pushed a button in his cell to alert jail staff that he needed medical attention. An officer responded to the alert and told Plaintiff that he would inform medical. Plaintiff thereafter called booking, stating that he needed medical attention. *Id.* at 11. But he was not seen by any medical professionals until approximately noon that day.

Around 9:30 a.m. Robyn Skidmore, RN, administered Plaintiff's diabetes medication to him but did not take any further action to treat Plaintiff at that time. When Plaintiff was finally seen for his condition around noon, Skidmore assessed him and charted that "his penis has been overcome w/ edema and appears inverted. Testicles are swollen to the size of two fists. There is redness noted and an area that is black on the underside of his right testicle . . ." *Id.* Skidmore called Dr. Wood, who instructed her to send Plaintiff to the hospital immediately. Plaintiff was sent to the hospital at 12:17, minutes after Skidmore began her examination.

When Plaintiff arrived at the hospital, he was diagnosed with Fournier's Gangrene and sepsis. The doctors informed him that he had less than a 30% chance of survival. Goich Decl. ¶

5

44. As a result of the infection, Plaintiff's scrotal, penile, and perineal skin had to be surgically cut out and excised. Plaintiff underwent multiple surgeries and reconstruction; he lost all his scrotal tissue, and his testicles now reside in a surgically constructed pouch in his thigh. He was eventually discharged to a skilled nursing facility 21 days after being admitted to the hospital. When he finally returned to WCCF, his condition still required a vacuum assisted wound closure device.

## II.    THE JAIL'S GRIEVANCE POLICY AND PROCEDURES

At all relevant times during this dispute, Sheriff Terry Thompson was the Sheriff for Weber County. ECF No. 144 ("Thompson Decl.") ¶ 2. In September 2017, he was the final policy maker for WCCF and approved all policies affecting the medical unit. *Id.* ¶ 3. The Sheriff's Office contracted with Dr. Wood to diagnose and treat the Jail's inmates.

Weber County Sheriff's Office Correction's Division Policy Manual (the "Policy") sets forth inmate grievance procedures. Under the Policy, "any inmate may file a grievance relating to conditions of confinement, which includes . . . medical care . . . ." ECF No. 164-1, Ex. 36 ("Grievance Policy") at 609.2. The Policy provides that "staff shall attempt to informally resolve all grievances at the lowest level. All attempts to resolve a grievance shall be documented in the inmate's file." *Id.* at 609.3. If there is no resolution to the inmate's grievance at the lowest level, an inmate may then file a Level One Grievance Form (GF-1). The Form must be filed within five calendar days of an incident. *Id.* ("Within five (5) calendar days of an incident, or five (5) calendar days from the time the inmate knew or should have known about a[sic] grievable incident, he shall obtain and complete Section I of Grievance Form-1 (GF-1) and submit it to the appropriate staff member . . . ."). The language of the Policy indicates that the deadline is mandatory. Inmates cannot file a grievance once the deadline passes. If Level One fails, the

inmate has two more levels of appeal under the Policy before he has exhausted his administrative remedies. *Id.* at 609.3.2.

The Policy prohibits retaliation "against inmates using the grievance process." *Id* at 609.3.5. But the Policy also warns against "frivolous grievances," instructing staff to inform an inmate suspected of abusing the system that "continued behavior may result in disciplinary action." *Id.* at 609.3.6.

In addition to general grievance procedures, the Policy also sets forth specific guidelines for health care grievances. ECF No. 146-2, Ex. E ("Health Care Policy") at 701.4. Although healthcare grievances are "handled in accordance with the Inmate Grievances Policy," as just described, lower standards apply to how an inmate may initiate a grievance process. *Id.* The Policy provides that "[c]ustody personnel should minimize technical requirements for grievances and allow inmates to initiate the grievance process by briefly describing the nature of the complaint and the remedy sought." *Id*. Thus, the Policy itself suggests that an inmate may initiate a grievance for health care by simply describing an ailment and requesting a remedy such as hospitalization to custody personnel.

Although Plaintiff submitted numerous medical requests prior to his hospitalization, both electronically and orally, he never filed a Level One Grievance Form (GF-1). Upon his return from convalescent leave, Plaintiff did not file any complaints through WCCF's administrative process, assuming it unnecessary as he had already received the remedy he requested, hospitalization, albeit too late.

## LEGAL STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "A fact is material only if it might affect the outcome of the suit under the governing law. And a dispute over a material fact is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Foster v. Mountain Coal Co*., 830 F.3d 1178, 1186 (10th Cir. 2016).

Once the movant has met this burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When applying the summary-judgment standard, the court must "view the evidence and make all reasonable inferences in the light most favorable to the nonmoving party." *N. Nat. Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008). The court must grant summary judgment on a claim if the party bearing the burden of proof at trial "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322. When a court is presented with cross-motions for summary judgment, it must take each motion separately, viewing the facts in the light most favorable to one party and then viewing the facts in the light most favorable to the opposing party. *See Dirty Boyz Sanitation Serv. v. City of Rawlins*, 889 F.3d 1189, 1195 (10th Cir. 2018).

## ANALYSIS

Defendants move for summary judgment on all of Plaintiff's claims on two grounds. First, Defendants argue that Plaintiff failed to exhaust his administrative remedies as required under the Prison Litigation Reform Act ("PLRA" or the "Act"). Defs.' Mot. at 3. Of note, the PLRA exhaustion requirement only applies to federal claims. 42 U.S.C. § 1997e(a). And Defendants do not address whether an exhaustion requirement applies to Plaintiff's state law

claim. Second, Defendants argue that they are entitled to qualified immunity and that Plaintiff cannot show deliberate indifference on behalf of any Defendant or that any individual Defendant violated clearly established law. Defs.' Mot. at 2.

Plaintiff moves for partial summary judgment on two claims. First, he seeks judgment that Defendant Manore Earl violated his constitutional rights because there is no genuine dispute of fact that she was deliberately indifferent to a high risk of harm. Second, he seeks judgment that Weber County's policies or customs and practices caused a significant delay in his medical care, in violation of his constitutional rights.

The court first addresses whether Plaintiff failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act. The court then turns to whether qualified immunity applies to any of the Defendants. Defendants move for summary judgment "on all claims," but completely fail to address Plaintiff's state law claim. Because Defendants made no effort to demonstrate they are entitled to summary judgment on Plaintiff's claim under the Utah Constitution, the court **DENIES** summary judgment on that claim for all Defendants.

## I.    ADMINISTRATIVE EXHAUSTION

Defendants argue that Plaintiff's federal claims are barred by the Prison Litigation Reform Act for failure to exhaust administrative remedies. The Act provides that a plaintiff seeking relief under 42 U.S.C. § 1983 or any other federal law may not bring an action "until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a). Failure to exhaust is an affirmative defense that Defendants must allege and prove. *See Jones v. Bock*, 549 U.S. 199, 204 (2007).

A plaintiff must "exhaust administrative remedies even where the relief sought--monetary damages--cannot be granted by the administrative process." *Woodford v. Ngo*, 548 U.S. 81, 85

(2006) (citing *Booth v. Churner*, 532 U.S. 731, 734 (2001) (holding that Congress' removal of the word "effective" "mandated exhaustion . . . regardless of the relief offered through the administrative process." Congress intended to broaden exhaustion requirements and prevent plaintiffs from "skip[ping] the administrative process simply by limiting prayers for relief to money damages not offered through administrative grievance mechanisms."). Further, partial completion of a jail's grievance process does not satisfy exhaustion requirements. *Jernigan v. Stuchell*, 304 F.3d 1030, 1032 (10th Cir. 2002) ("An inmate who begins the grievance process but does not complete it is barred from pursuing a § 1983 claim under PLRA for failure to exhaust his administrative remedies.").

While an inmate must exhaust available remedies, he need not exhaust unavailable ones. *See Ross v. Blake*, 578 U.S. 632, 642 (2016). Once a defendant has met the burden of proving the plaintiff did not exhaust administrative remedies, the burden shifts to the plaintiff to "show the remedies were unavailable to him." *May v. Segovia*, 929 F.3d 1223, 1234 (10th Cir. 2019). The Supreme Court has held that a remedy may be unavailable when (1) "it operates as a simple dead end," (2) the "administrative scheme . . . [is] so opaque that it becomes, practically speaking, incapable of use," or (3) "prison administrators thwart inmates from taking advantage of the grievance process through machination, misrepresentation, or intimidation." *Ross*, 578 U.S. at 643-44. And some courts have held that "a remedy is not available to a person who is physically unable to pursue it." *Cox v. Peters*, 2021 U.S. Dist. LEXIS 105098 at *19-20 (D. Or. 2021) (citing *Hurst v. Hantke*, 634 F.3d 409, 412 (7th Cir. 2011)).

Here, Defendants make a prima facie case that Plaintiff failed to exhaust his administrative remedies. It is undisputed that Plaintiff failed to file a Level One Grievance Form within the applicable time frame. *See Woodford*, 548 U.S. at 90 ("Proper exhaustion demands

10

compliance with an agency's deadlines . . ."). Although Plaintiff argues that Defendants rely on inapplicable policies, Plaintiff provides WCCF's grievance policies in his own Appendix. *See* Grievance Policy. Defendants do not object that the policy provided by Plaintiff applies, and therefore this is the policy the court will consider. Furthermore, Plaintiff filed a grievance on an unrelated issue the following January, demonstrating Plaintiff knew of the grievance process and how to use it. But Plaintiff responds that (1) remedies were unavailable during the time he could have submitted a grievance before the deadline, and (2) once Plaintiff was able to submit a grievance, the deadline had passed, and he therefore was no longer required to submit a grievance to exhaust his remedies. The court addresses these issues in turn.

### A.    Administrative Remedies were Unavailable

First, Plaintiff argues that Defendants are not entitled to summary judgment because administrative remedies were unavailable before the grievance deadline of five days had expired. The court agrees. When viewing the facts in the light most favorable to Plaintiff, any remedy Plaintiff sought before the grievance deadline operated as a dead end. *See Ross*, 578 U.S. at 643 ("An administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end — with officers unable or consistently unwilling to provide any relief to aggrieved inmates.").

On August 29, Plaintiff first notified staff of his medical issues. The ensuing response, or lack thereof, led him to eventually file an electronic sick call request, pleading for hospitalization. However, the request resulted in even less care and detention in a more restrictive cell. But Defendants closed the request before assessing Plaintiff's medical status. Early in the morning on September 2, Plaintiff again alerted prison staff that he needed care and called booking to request to be seen by medical. But Plaintiff was not seen until noon that day.

11

These instances are the only documented complaints on file. However, in his declaration, Plaintiff testified that he voiced his complaints to every staff member he encountered over the course of a few days. Other witnesses testified in depositions that Plaintiff complained to them, to which all responded he would need to take his complaint up with medical. Furthermore, given the pungent smell that accompanied Plaintiff's illness, anyone who interacted with him that day would be necessarily aware that he was unwell. But only after five days of pain, suffering, and humiliation did Plaintiff receive the care he needed. These facts, when viewed in the light most favorable to Plaintiff, show that administrative remedies were unavailable because they operated as a dead end.

Defendants argue that Plaintiff failed to exhaust administrative remedies because he never filed a Level One Grievance Form. *See* ECF No. 177 ("Defs.' Resp.") at 16. But the Policy provides, regarding health care grievances, that "[c]ustody personnel should minimize technical requirements for grievances and allow inmates to initiate the grievance process by briefly describing the nature of the complaint and the remedy sought." Health Care Policy at 701.4. Plaintiff did just that. He made multiple complaints about his medical condition to custody personnel and medical staff both orally and electronically. Most notably, Plaintiff electronically submitted a written sick call request on September 1 in which he complained that his testicles had doubled in size every day, requested to be sent to the hospital, offered to pay for his own hospitalization, and then warned that he would call his attorney if his request was ignored. Indisputably this communication describes the nature of the complaint, his medical condition, and the remedy sought, hospitalization, to custody personnel. Yet the only action taken by staff in response to this grievance was to close the request rather than initiating the grievance process.

Even if the court disregards the lower standard to initiate a health care grievance, WCCF's general grievance policies provide an informal level prior to the submission of a Level One Grievance Form. The Policy Manual states that "[s]taff shall attempt to informally resolve all grievances at the lowest level." Grievance Policy at 609.3. If this level fails, an inmate may then request a Level One Grievance Form. *Id.* Plaintiff attempted to pursue the grievance process through the sick call request and by notifying numerous custodial personnel of his need for medical care. He was told by non-medical staff that he needed to go through medical for remedial action. By the time it was clear that Plaintiff should escalate the grievance to fill out a Level One Grievance Form, he was debilitated in a feces-infested medical cell. At that point, Plaintiff was "physically unable to pursue" the remedies available to him. *Cox*, 2021 U.S. Dist. LEXIS 105098 at *19-20.

For five days straight Plaintiff complained to various medical and prison staff, asking to be sent to the hospital to address his medical condition. Yet staff members were "consistently unwilling to provide any relief" to Plaintiff. *Ross*, 578 U.S. at 643. When Plaintiff's deadline to submit a Level One Grievance Form passed, Plaintiff was in the intensive care unit in the hospital fighting for his life. Once Plaintiff returned from the hospital after a month of intensive surgery and recovery, there was no remedy that Defendants could provide because the deadline to file a grievance had expired. It was too late. Thus, Plaintiff has set forth sufficient evidence to demonstrate that administrative remedies were unavailable to him prior to the grievance deadline.

## B.    Plaintiff Need not Submit a Grievance after the Deadline

Defendants next argue that Plaintiff has not shown that the Policy barred him from filing a late grievance. Indeed, Plaintiff did not pursue his grievance to exhaustion once he was

13

physically able to do so. The issue is whether Plaintiff was required to pursue his complaint after the deadline had passed.

Defendants cite *Crowson v. Wash. County*, in which the court held that the plaintiff failed to exhaust his administrative remedies by not filing a late grievance. 2023 U.S. Dist. LEXIS 167840, at *14 (D. Utah 2023). However, in *Crowson*, the operative policy stated that grievances *should* be filed within a certain time period. The court reasoned that the permissive language prevented the court from interpreting the policy to categorically exclude late grievances. This, coupled with evidence that the plaintiff had been allowed to submit late grievances on other occasions, led the court to hold that the plaintiff did not show that he would have been barred from filing a late grievance and thus had failed to exhaust his administrative remedies.

Unlike the applicable policy in *Crowson*, which arguably allowed for the filing of late grievances, the Policy at issue here includes mandatory language requiring the timely filing of claims, and there is no evidence that Plaintiff had been permitted to file a late grievance on other occasions. The Policy clearly states, "Within five (5) calendar days of an incident, or five (5) calendar days from the time the inmate knew or should have known about a[] grievable incident, he *shall* obtain and complete Section I of Grievance Form-1 (GF-1) and submit it to the appropriate staff member . . . ." Grievance Policy at 609.3.2 (emphasis added).

Defendants point to an excerpt from the Policy that states, "[a] grievance should be filed by an inmate within 5 days of the complaint or issue." *Id.* at 609.3. This language seems to suggest that five days is not an absolute deadline. But other portions of the Policy contain mandatory language. Furthermore, the provision that contains permissive language is situated within the overview of the grievance process. When turning to the specific instructions for submitting a Level One Grievance Form, the Policy mandates the grievance *must* be filed within

14

five days. Unlike the *Crowson* policy, which did not mandate an inflexible deadline, the Policy here appears to do so. And because Plaintiff had never been permitted to submit a late grievance, it was reasonable, both objectively and subjectively, for him to conclude that the Policy did not permit him to file a late grievance. Therefore, once Plaintiff was physically able to file a grievance after returning from convalescent leave, the administrative process was no longer available to him as the five-day deadline had lapsed.

Plaintiff has produced sufficient evidence to show administrative remedies were unavailable to him. Thus, his federal claims are not barred by the Prison Litigation Reform Act exhaustion requirement.

## II.    QUALIFIED IMMUNITY

Defendants next argue that the remaining individual defendants and Weber County are entitled to qualified immunity. Defs.' Mot. at 15. Once a defendant raises a defense of qualified immunity, the burden shifts to the plaintiff to show that (1) the defendant's conduct violated a constitutional right and (2) the right was clearly established at the time of the violation. *See Estate of Smart v. City of Wichita*, 951 F.3d 1161, 1168 (10th Cir. 2020). Defendants argue that Plaintiff cannot show that any Defendant violated his Eighth Amendment rights or that any individual defendant's actions were contrary to clearly established law. Plaintiff also moves for summary judgment on the basis that there is no dispute of fact that Defendant Manore Earl and Weber County were deliberately indifferent to a high risk of harm to Plaintiff and thus not subject to qualified immunity. The court will address Plaintiff's motion along with Defendants' qualified immunity claims for Manore Earl and Weber County.

### A.  Constitutional Violation – Eighth Amendment

To prove a claim under the Eighth Amendment, "an inmate must show that he was exposed to an objective risk of serious harm and that prison officials subjectively acted with deliberate indifference to inmate health or safety." *Valentine v. Collier*, 141 S. Ct. 57, 60 (2020). A prison official acts with deliberate indifference when he or she "knows of and disregards an excessive risk to inmate health or safety." *Johnson v. Prentice*, 144 S. Ct. 11, 14 (2023). Thus,

> proper application of the deliberate-indifference standard when evaluating a prison official's motion for summary judgment requires consideration of two factbound factors: first, whether the [] deprivation at issue posed a substantial risk to the prisoner's health or safety, and second, whether prison officials 'knowingly and unreasonably disregard[ed]' that risk of harm.

*Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 845-46 (1994)).

The first prong is easily met here. There is no reasonable dispute that Plaintiff suffered a substantial risk to his health when Defendants delayed his hospitalization. Once Plaintiff finally arrived at the hospital, he was septic and had less than a 30% chance of survival. As a result of Defendants' conduct, Plaintiff will endure permanent injuries for the rest of his life. Indeed, Defendants do not attempt to oppose this conclusion. Rather, they argue that Plaintiff cannot show deliberate indifference on behalf of any individual defendant. The court addresses each defendant below.

### 1) RN Manore Earl

Defendants assert Plaintiff cannot show deliberate indifference on behalf of Manore Earl. The court disagrees. Plaintiff has identified specific facts demonstrating a genuine dispute as to whether Manore Earl knowingly and unreasonably disregarded a substantial risk of harm to Plaintiff.

First, Manore Earl waited to examine Plaintiff until near the end of her shift, despite his urgent sick call request. Second, Manore Earl expressed a total disregard for Plaintiff's condition, complaining to Dr. Wood that he had been "making a fuss." Third, Manore Earl observed firsthand that Plaintiff's testicles were the size of small cantaloupes and had a dark black greenish color but failed to report these facts to Dr. Wood or send Plaintiff to the hospital. Finally, Manore Earl observed Plaintiff at the critical juncture when his symptoms had progressed to the point that they posed an "excessive risk to [his] health and safety." *Johnson*, 144 S. Ct. at 14. Even if she could not treat Plaintiff herself, she was Plaintiff's gatekeeper who was key to his ability to receive further medical treatment. "[D]eliberate indifference occurs when prison officials prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment." *Sealock v. Colorado*, 218 F.3d 1205, 1211 (10th Cir. 2000). Plaintiff has identified sufficient disputed facts to show Manore Earl deliberately failed in her gatekeeping role.

> If . . . the medical professional knows that [her] role in a particular medical emergency is solely to serve as a gatekeeper for other medical personnel capable of treating the condition, and if [she] delays or refuses to fulfill that gatekeeper role due to deliberate indifference, it stands to reason that [she] also may be liable for deliberate indifference from denying access to medical care.

*Id.* When viewing these facts in the light most favorable to Plaintiff, a reasonable jury could conclude Manore Earl knowingly and unreasonably disregarded Plaintiff's urgent condition.

Citing *Sealock*, Defendants argue that whether Manore Earl reported all critical information to Dr. Wood is irrelevant. In *Sealock*, the Tenth Circuit upheld the district court's grant of summary judgment to a nurse who may have failed to pass on information that the inmate had unexplained chest pain to the physician's assistant. The Tenth Circuit reasoned that at

most the nurse was negligent, not deliberately indifferent. But unlike *Sealock*, Plaintiff has offered sufficient evidence to suggest Manore Earl's failure to pass on information to Dr. Wood may have been more than mere negligence. Her complaints to Dr. Wood that Plaintiff had been making a fuss coupled with her failure to provide Dr. Wood with critical information about her observations give rise to the reasonable inference that her indifference was deliberate. At least a reasonable jury could conclude as such.

Indeed, receiving a report of chest pain from an inmate is quite different from observing gangrene cantaloupe-sized testicles, accompanied with an overwhelming stench of rotting flesh, on a 51 year-old obese patient with diabetes and previously diagnosed but unresolved genital infection. Just like a patient who has been shot in the leg does not need to tell a medical professional that he needs urgent care, a patient with gangrene cantaloupe-sized testicles likely does not need to tell a nurse he needs to be sent to the hospital. And Dr. Wood testified that he expected the Jail's nurses to send an inmate to the hospital without his approval if the situation warranted it. Therefore, Plaintiff has supplied the court with sufficient evidence to show there is a genuine dispute of fact as to whether Manore Earl was deliberately indifferent for failing to send Plaintiff to the hospital.

Conversely, when viewing these facts in the light most favorable to Defendant, a dispute of fact still remains as to whether Manore Earl "knowingly and unreasonably disregard[ed] an objectively intolerable risk of harm." *Farmer*, 511 U.S. at 846. Afterall, Manore Earl did provide Plaintiff with some treatment. A reasonable juror may conclude that Manore Earl was negligent or reckless, rather than deliberately indifferent to Plaintiff's plight. As a new nurse, Manore Earl testified that she was not familiar with Fournier's Gangrene or the urgency of Plaintiff's medical condition. And there remains a factual dispute as to the information that she conveyed to Dr.

18

Wood after examining Plaintiff. A reasonable juror may believe Manore Earl's testimony and
conclude that she did provide complete information to Dr. Wood and reasonably relied on his
advice. Therefore, the court finds Defendants have also demonstrated a dispute of material fact
as to whether Manore Earl was deliberately indifferent. The court thus **DENIES** Plaintiff's
motion for summary judgment with respect to Manore Earl.

### 2) RN Kilfoyle

Defendants argue that Defendant Kilfoyle is also entitled to summary judgment. Plaintiff
responds that RN Kilfoyle "had to be keenly aware of the dire nature of [Plaintiff's] condition."
Pl.'s Opp. at 51. And Plaintiff has put forth specific facts to demonstrate as much. Indeed,
Kilfoyle visited Plaintiff's medical cell the night of September 1 and dispensed additional gauze
pads for him to clean up his oozing abscess, but did not bother to examine him even though he
had access to Plaintiff's medical records detailing Manore Earl's report regarding the size of
Plaintiff's testicles and would necessarily have smelled the stench of Plaintiff's rotting flesh.
Thereafter, Kilfoyle summarily closed out Plaintiff's sick call request, demonstrating that he had
seen Plaintiff's urgent medical complaint and did nothing about it. Given this evidence, a
reasonable jury could certainly conclude that Kilfoyle had personal knowledge of the severity of
Plaintiff's medical condition. Thus, Plaintiff has offered sufficient evidence to show there
remains a dispute of fact as to whether Kilfoyle was deliberately indifferent to Plaintiff's urgent
medical needs.

### 3) RN Nielsen Ryan

Unlike the evidence showing potential indifference by Kilfoyle, there is no evidence
suggesting that Nielsen Ryan was aware of Plaintiff's condition. There is no documentation that
Nielsen Ryan interacted with Plaintiff during her shift. She was not assigned to treat Plaintiff so

there is no evidence to suggest that she would have reviewed his medical records. There are simply no facts suggesting that Nielsen Ryan was deliberately indifferent. Therefore, the court **GRANTS** summary judgment for Defendant Nielsen Ryan.

### 4) RN Skidmore

Defendants also argue that RN Skidmore is entitled to summary judgment. But Plaintiff has demonstrated a dispute as to when Skidmore became aware of Plaintiff's critical medical condition. The record does not indicate exactly when Skidmore began her shift, but she did administer diabetes medication to Plaintiff at 9:30 a.m. It is unclear whether Plaintiff called booking before or after Skidmore interacted with him that morning or how much Skidmore knew about Plaintiff's urgent medical request. Plaintiff has established, however, that Skidmore did not see him until noon that day despite starting her shift early that morning. From these facts, a reasonable jury could conclude that Skidmore knew of Plaintiff's urgent medical condition and yet refused to check on him for hours, allowing his life-threatening infection to spread. Therefore, the court finds that there remains a dispute of fact as to whether Skidmore was deliberately indifferent to Plaintiff's serious medical needs.

### 5) Sherriff Terry Thompson

Defendants next move for summary judgment on behalf of Defendant Sheriff Thompson. Sheriff Thompson never directly observed or interacted with Plaintiff. "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). To prove an official has violated the Constitution by his own individual actions, a plaintiff "must demonstrate an affirmative link between the supervisor and the [constitutional] violation," which requires proof of three elements: (1) personal involvement,

20

(2) causation, and (3) state of mind. *Dodds v. Richardson*, 614 F.3d 1185, 1195 (10th Cir. 2010)

(internal quotation marks omitted). Personal involvement may be established by a supervisor's

failure to train or implement and enforce policies. *See, e.g.*, *Keith v. Koerner*, 843 F.3d 833 (10th

Cir. 2016).

Plaintiff argues that Sheriff Thompson's personal involvement in the violation of

Plaintiff's constitutional rights derives from Sheriff Thompson's failure to train and properly

supervise WCCF staff. "[A] supervising prison official may be liable [w]here there is essentially

a complete failure to train, or training that is so reckless or grossly negligent that future

misconduct is almost inevitable." *Id.* at 838. This standard requires more than a showing of

"general deficiencies in a particular training program." *Id.* (internal quotation marks omitted).

Rather, to meet this high burden, "a plaintiff must identify a specific deficiency in the [entity's]

training program closely related to his ultimate injury, and must prove that the deficiency in

training actually caused his jailer to act with deliberate indifference to his safety." *Id.* at 839

(internal quotation marks omitted).

Plaintiff argues that Sheriff Thompson failed to provide proper training and supervision

for the Jail's medical staff. Specifically, Plaintiff points to the lack of nursing protocols,

oversight, and training records. Several of the individual defendants, including Manore Earl,

believed they could not send an inmate to the hospital without approval from Dr. Wood, even in

an emergency. But Dr. Wood testified that this was not the protocol. At the very least, Plaintiff

has identified a dispute of fact as to whether WCCF staff had proper protocols in place to ensure

effective responses to medical emergencies. Further, Plaintiff points to the complete dearth of

oversight over new nurses. Defendants admit that September 1 was Manore Earl's first day on

the job. But there is nothing in the record showing any supervision that day, let alone any

21

training prior to her first shift. In fact, all medical record entries that day were made by Manore Earl; there is no evidence of a supervisor. Defendants also failed to produce *any* record of training for the nurses who operated in the Jail, including Manore Earl.

The lack of nursing protocols, supervision, and proper training may have caused the individual defendants to act with deliberate indifference to Plaintiff's injuries. In fact, Plaintiff's injuries were caused by the delay in his hospitalization, and a reasonable juror may conclude that injury is directly tied to the medical staff's lack of training, supervision, and protocols. In short, Plaintiff has identified numerous, specific deficiencies in the Jail's training program that are closely related to his ultimate injury. *See Keith*, 843 F.3d at 839. Therefore, Plaintiff has met the first two elements of an "affirmative link" between the supervisor and alleged constitutional violation, personal involvement and causation.

Next, Plaintiff argues that Sheriff Thompson possessed a culpable state of mind, the third element of an "affirmative link." *Dodds*, 614 F.3d at 1195. "[T]o establish the third prong of the constitutional-violation analysis—culpable state of mind—a § 1983 plaintiff alleging an Eighth Amendment violation must prove that the defendant acted with deliberate indifference." *Keith*, 843 F.3d at 847-48. Deliberate indifference requires "that the official actually be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 848.

Plaintiff argues that Sheriff Thompson's deliberate indifference is demonstrated by his complete failure to ensure proper training or supervision for his staff. Indeed, "[i]naction, in certain instances, can be enough—a local government policymaker is deliberately indifferent when he deliberately or consciously fails to act when presented with an obvious risk of constitutional harm which will almost inevitably result in constitutional injury of the type

22

experienced by the plaintiff." *Id.* Further, once Sheriff Thompson learned of this incident, he made no effort to investigate, evaluate, or learn from Plaintiff's experience. A jury may conclude that this inaction shows Sheriff Thompson had knowledge of a high risk of harm to his inmates and yet did nothing about it, even when an inmate nearly died in his custody.

Here, there remains a dispute of fact as to (1) whether a substantial risk of harm existed due to the lack of training at WCCF and if so, (2) whether Sheriff Thompson was aware of that risk. Sheriff Thompson stated that he largely relied on hired medical professionals to handle proper medical training. Thompson Decl. ¶ 6. And Sheriff Thompson insisted that Dr. Wood and his professionals always provided proper care and adequate training. *Id.* ¶ 7. But there are no records suggesting this to be the case. From these facts, a reasonable juror could conclude that Sheriff Thompson consciously failed to implement any policy to ensure medical staff were properly trained, creating an obvious risk of constitutional harm to WCCF inmates.

### 6) Weber County

Although municipalities may not be held liable for actions of their employees alone under § 1983, Weber County may be held liable for its policies and customs. *See Monell v. Dept't of Soc. Servs.*, 436 U.S. 658, 695 (1978). To establish a claim for local government liability under § 1983, Plaintiff must prove that "deliberate action attributable to the municipality itself is the 'moving force' behind the plaintiff's deprivation of federal rights." *Bd. of the Cnty. Comm'rs v. Brown*, 520 U.S. 397, 400 (1997) (quoting *Monell*, 436 U.S. at 694). Like individual supervisor liability, the plaintiff must show three elements: "(1) official policy or custom, (2) causation, and (3) state of mind." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013).

23

Because Sheriff Thompson is the final policy maker for Weber County, his constitutional violations also give rise to Weber County liability. *See Randle v. City of Aurora*, 69 F.3d 441, 447 ("[I]f an official, who possesses final policymaking authority in a certain area, makes a decision--even if it is specific to a particular situation--that decision constitutes municipal policy for 1983 purposes."). "Hence, [Sheriff Thompson's acts] can be understood as an act 'of the municipality' which the municipality 'officially sanctioned or ordered.'" *Id.* (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986). Therefore, if a jury finds Sheriff Thompson's failure to ensure proper training and supervision over the Jail nurses constitute deliberate indifference, Weber County would be liable as these are official acts by its final policymaking authority. In addition to Sheriff Thompson's official acts and omissions, Plaintiff also argues several theories of County liability outside of Sheriff Thompson's official acts, including a failure to train and a custom of retaliation. The court addresses each theory below.

a)  Failure to Train

Like his allegations against Sheriff Thompson, Plaintiff's claims against Weber County allege that the County failed to adopt a policy for adequately training its medical staff. Indeed, as the court has already discussed, a reasonable jury may infer that a complete lack of training records indicates the medical staff received no training on health emergencies or urgent medical conditions. Further, Plaintiff has identified a dispute of fact as to whether Manore Earl was properly supervised on her first day of work and whether a protocol existed that required nurses to seek approval from Dr. Wood before sending inmates to the hospital, even in emergencies. Due to the lack of training and adequate nursing protocols, the nurses who interacted with Plaintiff were not equipped to respond to his critical medical issue, resulting in his near-death experience. Thus, Plaintiff has met the first two prongs of municipality liability.

As to the third prong, "[a] pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 563 U.S. 51, 62 (2011). But the Supreme Court has recognized single-incident failure-to-train claims where "the failure to train amounts to deliberate indifference to [constitutional rights]." *City of Canton v. Harris*, 489 U.S. 378, 389 (1989); *see also Valdez v. Macdonald*, 66 F.4th 796, 811-12 (10th Cir. 2023). To establish deliberate indifference in a single-incident failure-to-train claim, the Tenth Circuit applies a three-part test:

> (i) the municipality's policymakers know to a moral certainty that their employees will confront a given situation; (ii) the situation presents the employee with a difficult choice of the sort that training or supervision will make less difficult; and (iii) [t]he wrong choice will frequently cause the deprivation of a citizen's constitutional rights.

*Id.* at 817. *See also Schneider*, 717 F.3d at 773 ("A municipality can be liable where the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.").

Here, the facts arguably demonstrate that Weber County knew, to a moral certainty, that its staff would encounter legitimate and serious medical problems in the inmates in their custody. Some of these inmates, like Plaintiff, will be high risk and suffer from life-threatening health issues. For example, in oral argument, Weber County acknowledged the high risk posed by heart attacks as one potential emergency its staff may face. Weber County's knowledge is further evidenced by the fact that WCCF hired medical personnel for 24/7 coverage.

And critical health emergencies such as the one Plaintiff experienced present employees with a difficult choice in how to handle them. Here, *any* supervision over medical training would

have allowed the WCCF staff to adequately respond to this incident, and likely would have prevented the life-altering injuries Plaintiff suffered. The fact that multiple nurses failed to escalate such an obvious risk to inmate health demonstrates that the "the need for more or different training is so obvious" at WCCF, and "the inadequacy [of training] so likely to result in the violation of constitutional rights." *Id.*

Furthermore, the fact that there is no evidence WCCF or Weber County has made any attempt to learn from this situation or conduct a post-incident investigation is further evidence from which a jury could infer that the County was and perhaps *is* still deliberately indifferent to the constitutional rights of its inmates. The medical team and custodial staff's lack of training on how to handle medical complaints directly caused Plaintiff's injuries. Had medical staff been properly trained or had Jail staff taken his medical complaint seriously, Plaintiff would have been sent to the hospital before he was nearly dead. Thus, Plaintiff has identified a dispute of material fact as to Weber County's liability under a failure to train theory.

Conversely, in viewing these facts in the light most favorable to Defendants, a dispute of fact still remains as to whether Weber County was deliberately indifferent to the health of those in its custody. Sheriff Thompson, the ultimate policymaker for Weber County, insists that all medical staff were adequately trained and each newly hired nurse on shift was provided with adequate oversight. Thompson Decl. ¶ 6-7. A jury could find his testimony credible and conclude that WCCF provided adequate training or that any inadequacy in WCCF training was not so obvious that it was likely to result in a deprivation of constitutional rights.

### b) Custom of Retaliation

Plaintiff also argues that Weber County's custom of retaliation caused a deprivation of his constitutional rights. And Plaintiff has identified several facts to establish the existence of

this custom or practice. First, after submitting a sick call request pleading for hospitalization, Plaintiff was moved to a more restrictive cell rather than being sent to medical. Second, medical providers did not respond to his sick call request until late afternoon, closing out his request even though his condition had not been addressed. Third, when Plaintiff was finally sent to a medical cell, he was told to clean up blood and feces despite his health status. Plaintiff testified that this mistreatment by Jail staff was the expectation among the inmates. Fourth, over the course of five days, Plaintiff complained to several staff members who would inevitably have smelled the stench of Plaintiff's rotting flesh, but not one assisted him in seeking the proper care. Finally, Plaintiff points to the Policy itself, which warns against an inmate's abuse of the grievance system, demonstrating that "the [P]olicy itself [] intimidates inmates and discourages legitimate grievances." Pl.'s Opp. at 53. From these facts, a reasonable juror could conclude WCCF has a custom of retaliating against inmates who seek medical care.

Further, Plaintiff has demonstrated a dispute of fact as to whether his injuries were caused by WCCF's custom of retaliation. Rather than treating Plaintiff's urgent condition or sending him to the hospital, Jail staff continued to disregard his complaints. A reasonable jury may conclude that this attitude toward Plaintiff's health and safety resulted in permanent life-altering injuries that could have been prevented. Thus, Plaintiff has met the first two elements to show Weber County liable under a theory that Weber County had a custom of retaliation.

Under the third prong, Plaintiff has also demonstrated a dispute of fact as to whether Weber County was deliberately indifferent to its inmates' constitutional rights. "The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Schneider*, 717 F.3d at 771.

Failing to prevent or encouraging retaliation against inmates who seek medical care is "substantially certain to result in a constitutional violation." *Id.* And Plaintiff has identified several facts that go to Weber County's notice of this practice among its staff. Notably, there is no evidence that Weber County did anything in response to Plaintiff's experience. The County did not investigate the incident, nor did it attempt in any way to learn from its disastrous missteps. A reasonable jury may conclude that Weber County's failure to address such a grave error to prevent future mistakes demonstrates its deliberate indifference to the welfare of its inmates. In viewing Plaintiff's testimony that his treatment in the medical cell was "typical" in the light most favorable to him, a reasonable jury may conclude that this shows "a pattern of tortious conduct," thereby establishing that Weber County had notice of a pattern of retaliation in its Jail. *Id.* Thus, Plaintiff has identified evidence from which a reasonable jury may conclude that Weber County had a deliberately indifferent state of mind.

On the other hand, a jury may also give little weight to Plaintiff's testimony and conclude that a custom of retaliation did not exist. Defendants point to the Policy, which prevents retaliation against inmates for submitting grievances. A jury may conclude that this Policy is enough to indicate that Weber County did not have a deliberately indifferent state of mind.

In viewing the facts in the light most favorable to the Plaintiff, the court concludes that there remains a dispute of fact as to whether Weber County was deliberately indifferent to the constitutional rights of its inmates. In viewing the facts in the light most favorable to the Defendants, the court also concludes that there remains a dispute of fact as to whether Weber County was deliberately indifferent. Therefore, the court **DENIES** Plaintiff's motion for summary judgment as to Weber County.

### B.    Clearly Established Law

Having concluded that Plaintiff has shown a genuine dispute of fact regarding the alleged deliberate indifference of Defendants Manore Earl, Kilfoyle, Skidmore, Sheriff Thompson, and Weber County, the court considers the second prong of the qualified immunity analysis for these defendants.

To establish the second prong of the qualified immunity analysis, Plaintiff must show that Defendants violated clearly established law. "The law is clearly established when there is an 'on point' Supreme Court or Tenth Circuit decision, or the clearly established weight of authority from other courts have found the law to be as the plaintiff maintains." *Paugh v. Uintah Cnty.*, 47 F.4th 1139, 1167 (10th Cir. 2022) (internal quotation marks omitted).

Defendants argue that Plaintiff offers no case law on point to demonstrate a clearly established right. But Plaintiff cites *Paugh*, in which the Tenth Circuit affirmed that "'deliberate indifference to an inmate's serious medical need is a clearly established constitutional right.'" *Id.* at 1167 (quoting *Mata v. Saiz*, 427 F.3d 745, 749 (10th Cir. 2005)). More specifically, "it is 'clearly established that when a detainee has obvious and serious medical needs, ignoring those needs necessarily violates the detainee's constitutional rights.'" *Id.* (quoting *Quintana v. Sante Fe Cty. Bd. of Comm'rs*, 973 F.3d 1022, 1033 (10th Cir. 2020)).

Here, Plaintiff has offered sufficient evidence to show a dispute of fact as to whether Defendants Manore Earl, Kilfoyle, Skidmore, Sheriff Thompson, and Weber County were deliberately indifferent to a high risk of harm to Plaintiff. There is no dispute that Plaintiff had a serious medical need when he begged to be hospitalized while incarcerated at the Jail. Thus, Plaintiff has met the second prong of the qualified immunity analysis because, as a matter of law, "deliberate indifference to an inmate's serious medical need is a clearly established constitutional right." *Id.*

29

Because there remains a genuine dispute as to whether Manore Earl, Kilfoyle, Skidmore, Sheriff Thompson, and Weber County were deliberately indifferent, the court cannot grant summary judgment in their favor. Thus, the court **DENIES** Defendants' motion for summary judgment with respect to these Defendants.

III.    **PLAINTIFF'S UTAH CONSTITUTION CLAIM**

Plaintiff also claims that Defendants violated the Constitution of the State of Utah Article I, Section 7, which provides that "No person shall be deprived of life, liberty, or property without due process of law." UTAH CONST. art. I, § 7. Defendants wholly fail to address Plaintiff's state law claim in the memoranda supporting their motion. As the movant bears the burden to show that "there is no genuine dispute as to any material fact," the court cannot grant Defendants summary judgment on Plaintiff's state law claim. FED. R. CIV. P. 56(a).

### CONCLUSION AND ORDER

For the foregoing reasons, Plaintiff's motion for partial summary judgment is **DENIED**, and Defendants' motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**:

(1) The court DENIES Defendants' motion for summary judgment on Plaintiff's federal claims against Defendants Manore Earl, Kilfoyle, Skidmore, Sheriff Thompson, and Weber County.

(2) The court GRANTS Defendants' motion for summary judgment on Plaintiff's federal claims against Defendant Nielsen Ryan.

(3) The court DENIES Defendants' motion for summary judgment on Plaintiff's claim under the Utah Constitution against all Defendants.

DATED February 19, 2025

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge

31